**MARC DEVELOPMENT, INC., an Illinois corporation, Keith–Marc Properties, Ltd., an Illinois limited partnership, and Brown Leasing, Inc., f/k/a Capitol Leasing Company, Plaintiffs,**

v.

**Philip A. WOLIN, Brian McLaughlin, Gerald J. DeNicholas and Alex M. Vercillo, Defendants.**

**No. 93 C 2037.**

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 23, 1995.

---

serve Act, 12 U.S.C. § 503, and under Illinois common law torts of intentional interference with contract, intentional interference with prospective business advantage, fraud and conversion. Before us now are defendants Wolin and DeNicholas' motions for summary judgment on those claims that remain against them.[3] Jurisdiction is proper under the rules of federal subject matter and supplemental jurisdiction. 28 U.S.C. §§ 1331, 1367. For the reasons set forth below, defendant DeNicholas' motion is granted, and defendant Wolin's motions are granted in part and denied in part.

Howard M. Cohen and Jeffrey W. Eich, Much Shelist Freed Denenberg & Ament, PC, Chicago, IL, for plaintiffs MDI and KMPL.

Michael J. O'Rourke, Thomas G. Griffin and Kelly A. McCloskey, O'Rourke & Griffin, Chicago, IL, for plaintiff Brown Leasing.

Stuart Berks and Phillip J. Zisook, Deutsch, Levy & Engel, Chartered, Chicago, IL, for defendant DeNicholas.

Richard H. Donohue and William M. Sneed, Baker & McKenzie, Chicago, IL, for defendant Wolin.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiffs Marc Development, Inc. ("MDI"), Keith–Marc Properties, Ltd. ("KMPL")[1] and Brown Leasing, Inc. ("Brown Leasing" or "Brown")[2] brought this action against Philip A. Wolin, Brian McLaughlin, Gerald J. DeNicholas and Alex M. Vercillo under § 22(f) of the Federal Re-

## FACTS

In the summer of 1989, Cosmopolitan National Bank ("Cosmopolitan") and Brown Leasing entered into two unrelated contracts, one of which resulted in Brown's participation in Cosmopolitan's funding of MDI/KMPL's real estate development in Utah ("Utah participation agreement"), and the other in Cosmopolitan's participation in four notes held by Brown ("four participations"). At issue here is Cosmopolitan's application of one of MDI/KMPL's loan repayments to Brown's share of the loan under the Utah participation agreement, and the Bank's subsequent setoff of the payment against Brown's obligations under the four participations. Plaintiffs allege that the application and setoff were fraudulent, tortious and in breach of contract and, further, that the Bank acted at the direction of Cosmopolitan's legal counsel (defendant Wolin), Cosmopolitan's executive vice-president, chief financial officer and director (defendant DeNicholas), Cosmopolitan's senior officer (defendant

1. MDI and KMPL will be referred to as "MDI/KMPL" throughout this opinion.

2. Brown Leasing was named "Capitol Leasing Company" when many of the transactions at issue here took place. For the sake of simplicity, however, we will refer to the company by its current name.

3. In a previous ruling, we dismissed plaintiffs' claims of intentional interference with prospective business advantage against Wolin and DeNicholas (one of two claims in Counts I and V of the complaint), and plaintiffs' 12 U.S.C. § 503 claim against Wolin (Count II). *Marc Development v. Wolin,* 845 F.Supp. 547 (N.D.Ill.1993).

The remaining grounds against Wolin are as follows: MDI/KMPL and Brown's tortious interference with contract claim (Count I); MDI/KMPL and Brown's fraud claim (Count III); and MDI/KMPL and Brown's conversion claim (Count IV). The active grounds against DeNicholas are: MDI/KMPL's tortious interference with contract claim (Count V); MDI/KMPL's § 503 claim (Count VI); MDI/KMPL's fraud claim (Count VII); and MDI/KMPL's conversion claim (Count VIII). Three summary judgment motions thus pend here: Wolin's motion against MDI/KMPL, his motion against Brown Leasing, and DeNicholas' motion against MDI/KMPL. All three motions will be resolved in this opinion.

McLaughlin), and Cosmopolitan's president, chief operating officer and director (defendant Vercillo), all of whom were acting to further their own personal interests.

The Utah participation agreement was part of a financing arrangement that Terry Brown, the principal of Brown Leasing, and Marc Kaplan, the principal of MDI/KMPL, took to Cosmopolitan in 1989. MDI/KMPL entered into a $5 million loan agreement with the bank, secured by three trust deeds ("Utah loan"). Brown Leasing was, in turn, going to participate in the loan, and it did enter into the Utah participation agreement with Cosmopolitan. There were, thus, two agreements. One was set forth in the rather voluminous Utah loan documents executed by MDI/KMPL and Cosmopolitan. The other was a form Certificate of Participation entered into between Brown Leasing and Cosmopolitan. Under the Utah participation agreement, Brown Leasing participated with Cosmopolitan up to the amount of $3.354 million of the up to $5 million loan to MDI/KMPL for development of property near the Deer Valley Ski Resort in Utah. Upon complete repayment of the Utah loan, or, as plaintiffs contend, repayment of Cosmopolitan's share, the Bank was to release the three trust deeds that had been used by MDI/KMPL to secure its indebtedness. The plaintiffs contend, and the record supports, that the parties anticipated that the Bank share of the loan would be repaid prior to Brown Leasing's share. This was plaintiffs' suggestion, according to Terry Brown, in order to make the loan more attractive to Cosmopolitan: the Bank was to advance its funds only after Brown Leasing advanced its funds and the Bank was to be paid first. Neither the Utah loan agreements nor the Utah participation agreement, however, so provided, and in practice the Bank was the first in rather than last in, although the initial repayments were credited solely to Cosmopolitan.

By November 1990, the amount outstanding under the Utah loan was approximately $1.78 million, all of which had been advanced by Cosmopolitan. At this point the Bank, which was experiencing financial difficulty, indicated that it would provide no more money under the Utah loan. Although Brown Leasing loaned an additional $2.239 million to MDI/KMPL for the project in 1991, plaintiffs contend that this sum was neither intended nor construed to be part of the Utah loan, as evidenced by separate promissory notes issued by MDI/KMPL to secure the loans. Defendants counter with a number of documents, some signed by plaintiffs themselves, which characterize Brown's loans as being part of the Utah loan in fulfillment of its obligations under the Utah participation agreement.

In a wholly separate June 1989 transaction, Cosmopolitan purchased from Brown undivided participations and interests in four notes held by Brown. Allegedly at the direction of Cosmopolitan, Brown took most of the proceeds from these four participations and loaned them to Jerome Cosentino, a state politician ("Cosentino loan"). Plaintiffs allege that Cosmopolitan guaranteed the Cosentino loan, despite the fact that the guaranty document was drafted on the letterhead of Cosmopolitan's parent company, Cosmopolitan Bancorp Inc., rather than on Cosmopolitan's letterhead. By late 1990, the Cosentino loan was in default and Cosmopolitan, the alleged guarantor, had not bought back the loan. Brown ceased paying Cosmopolitan its obligations under the four participations and initiated a lawsuit against Cosmopolitan to compel it to comply with the guaranty agreement and release Brown's interests in the four participations. During this period, Cosmopolitan alleges that Brown received approximately $325,000 from the owner of one of the notes, proceeds which Brown did not share with Cosmopolitan despite the mandate of the four participations agreement. Brown contends that its obligations to Cosmopolitan were not due when the Bank performed the setoff at issue here.

In early March 1991, MDI/KMPL began repayment on the Utah loan with two partial payments, both of which were used solely to reduce Cosmopolitan's share of the principal, leaving approximately $820,000 still owing the Bank. Brown Leasing was not given any percentage of the repayments. On March 28, 1991, MDI/KMPL wire-transferred the Bank slightly more than the full amount of

the outstanding debt attributable to the Bank, approximately $858,000, allegedly expecting that this payment also would be used solely to reduce, and thus extinguish, Cosmopolitan's loan. Plaintiffs allege that contrary to this expectation, which was grounded in the parties' course of dealing, defendants reversed Cosmopolitan's bookkeeping entry for MDI's March 28, 1991 principal payment and applied approximately $718,000 of the payment as a setoff to the four participations. Defendants contend that the Utah participation agreement required it to allocate MDI/KMPL's repayment in the manner that it did, and that the setoff was proper because Brown had breached the four participations.

On or around the day of the wire transfer, and one week prior to the setoff, Cosmopolitan had received a letter from the law firm of Kwiatt & Silverman, Brown's attorneys, demanding that MDI/KMPL's $858,000 payment be applied in one of the following two ways ("Kwiatt & Silverman demand letter"):

1. Pay Brown ... its "... pro rata share of that portion of the payment of collection which is attributable to principal at the rate stated" in the [Utah] Participation Agreement (a sum we calculate to be approximately $575,000);

2. Or for Cosmopolitan to forthwith release all right, title and interest it may have in and to the collateral referred to in said Participation Agreement since Cosmopolitan's interest therein has been fully satisfied and Cosmopolitan is therefore barred from asserting further claims in and to the Collateral referred to in the said Participation Agreement.

Although the letter states that Kwiatt & Silverman represented MDI, as well as Brown, MDI/KMPL contends that it never authorized Kwiatt & Silverman to prepare the demand letter on its behalf and it was sent without its advance knowledge or approval. Plaintiffs further assert that Cosmopolitan's setoff did not comply with the language or spirit of either option.

The application and setoff had a dual effect. First, MDI/KMPL's collateral was not returned because Cosmopolitan claimed that money was still owed under the Utah loan. Second, plaintiffs allege that by applying the MDI/KMPL payment to the four participations, defendants were able to report to federal regulators that there was an outstanding amount due on the MDI/KMPL loan and that the four participations—which had formerly been labeled troubled assets because of the pending lawsuit over the parties' obligations—were now performing assets. Plaintiffs allege that defendants purposely misrepresented the status of both loans in an attempt to injure Brown, MDI and KMPL, and to inflate the assets of Cosmopolitan to avoid closure of the bank by federal regulators.

Plaintiffs further contend that defendants were motivated by personal interests in maintaining the financial viability of Cosmopolitan. They argue that defendants had organized a group named Phoenix Financial to acquire control of Cosmopolitan, with DeNicholas and Wolin acting as principal investors in Phoenix, DeNicholas and Vercillo running it, and McLaughlin waiting for acquisition so he could become an integral part of the new bank management after Phoenix had acquired the Bank. At the time of the setoff and the months preceding it, Phoenix's alleged acquisition attempt was in jeopardy because the Federal Deposit Insurance Corporation (FDIC) had threatened to take the failing financial institution into receivership. Phoenix's alleged fears about FDIC intervention were justified. Shortly after the setoff at issue here the FDIC was appointed receiver of Cosmopolitan, despite defendants' alleged recordkeeping "creativity," and no entity, including Phoenix, was able to acquire it.

This suit was brought against the four named defendants, all of whom it is alleged acted outside their authority as agents of Cosmopolitan in causing the bank to apply MDI/KMPL's payment to Brown and subsequently set off the payment against the four participations. Defendant Wolin, who advised the bank to engage in the application and setoff, and defendant DeNicholas, who authorized these actions, now move for summary judgment on those claims that remain against them.

### DISCUSSION

**I. Counts I and V: Intentional Interference with Contractual Relations**

Both MDI/KMPL and Brown claim that defendants induced Cosmopolitan to breach

its contracts with them, an allegation sufficient to state a claim for intentional interference with contractual relations (also known as "tortious interference with contract"). Plaintiff MDI/KMPL's claims are rooted in defendants' roles in Cosmopolitan's application of the March 28 payment to Brown's share of the Utah loan. Since MDI/KMPL was not party to the four participations, it has no claim against defendants for the Bank's setoff. In contrast, plaintiff Brown Leasing's claim, which has been brought against defendant Wolin only, involves the alleged interference of two different contracts: the Utah participation agreement and the four participations. We must examine both Cosmopolitan's application of the March 28 payment *and* the subsequent setoff in order to resolve Wolin's motion for summary judgment against Brown's claims.

## A. *Privilege*

■ Initially, however, we address whether Wolin, Cosmopolitan's counsel, and DeNicholas, the Bank's officer, are insulated from the tortious interference claims against them. In Illinois, agents and employees enjoy a qualified privilege to counsel their employers on matters pertaining to contract performance, a privilege which shields them from claims of tortious interference with contract when the advice results in the employers' breach of contract. *See Prince v. Zazove*, 959 F.2d 1395, 1397 (7th Cir.1992). The privilege applies both to attorneys advising their clients and officers of corporations acting on their corporations' behalf. *See id.; HPI Health Care Services, Inc. v. Mount Vernon Hosp., Inc.*, 131 Ill.2d 145, 137 Ill. Dec. 19, 24, 545 N.E.2d 672, 677 (1989).

### 1. *Attorney Wolin's Privilege*

■ While "[a]n attorney is privileged to advise a client and to take action on a client's behalf," the privilege is lost if the attorney exhibits actual malice toward the plaintiff in advising his client. *Prince v. Zazove*, 959 F.2d at 1397. *See also Salaymeh v. InterQual, Inc.*, 155 Ill.App.3d 1040, 108 Ill.Dec. 578, 583, 508 N.E.2d 1155, 1160 (1987); *Arlington Heights Nat. Bank v. Arlington Heights Federal Sav. & Loan Ass'n*,

37 Ill.2d 546, 229 N.E.2d 514, 517 (1967). Actual malice is found when an attorney possesses a desire to harm, unrelated to the legitimate interest that he was presumably seeking to protect. *Prince v. Zazove*, 959 F.2d at 1397.

■ We note at the outset that the "actual malice" test requires us to consider the intent and motivation of a party, issues that have been held to be inappropriate for summary judgment when they dominate a claim. *See White Motor Co. v. United States*, 372 U.S. 253, 259, 83 S.Ct. 696, 700, 9 L.Ed.2d 738 (1963) (summary judgment inappropriate "where motive and intent play leading roles"); *Stumph v. Thomas & Skinner*, 770 F.2d 93 (7th Cir.1985) ("summary judgment is improper in a discrimination case where a material issue involves any weighing of conflicting indications of motive and intent"). Furthermore, on a motion for summary judgment "we must view the record and all inferences drawn from it in the light most favorable to the party opposing the motion." *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir.1989) (citations omitted). A plaintiff's conclusory statements alone, however, are insufficient to withstand a motion for summary judgment without factual support. *See id.; Nat. Bank v. Arlington Heights*, 229 N.E.2d at 518 (charge of actual malice must be supported by factual allegations).

■ Here MDI/KMPL and Brown Leasing allege that Wolin's actions were malicious because they were harmful, wrongful, and in his personal interests. They assert that Wolin intentionally induced Cosmopolitan's breach of the Utah loan and the Utah participation agreement in order to put his own project, Phoenix Financial, in a more opportune position. Evidence of Wolin's involvement in Phoenix, a group intent on acquiring the very bank for which he was providing counsel, lends factual support to these assertions. We find that plaintiffs have raised a reasonable inference of actual malice.

Plaintiffs' arguments focus more on Wolin's self-serving desires than any alleged ill will on his part toward them. Aside from an allegation by Brown that Wolin exhibited extreme anger when Brown announced its

intention to initiate legal action over the four participations, the record is devoid of allegations of any acts of overt ill will undertaken by Wolin. Actual malice, however, is not grounded in ill will, but in an attorney's desire to harm the plaintiffs which is unrelated to the interests of the attorney's client. *See Salaymeh v. InterQual, Inc.*, 108 Ill.Dec. at 583, 508 N.E.2d at 1160 (plaintiff must make factual allegations "from which it might be inferred that [the attorneys] had any interest in or relationship with plaintiff independent of serving their clients").

If Wolin's involvement in the setoff was, as is alleged, motivated by a desire to maintain Cosmopolitan's good standing with federal regulators for his own benefit, we can reasonably infer that Wolin had "a positive desire and intention to annoy or injure" the plaintiffs, even if he bore no particular antagonism toward them. *Miller v. St. Charles Condominium Ass'n*, 141 Ill.App.3d 834, 96 Ill.Dec. 311, 314, 491 N.E.2d 125, 128 (1986). Taking plaintiffs' allegations as true, Brown's refusal to make payments on the four participations interfered with Phoenix's ability to acquire Cosmopolitan, a consideration which set Wolin's interests apart from those of his client. Similarly, although Wolin apparently had few prior dealings with MDI/KMPL, and had no direct responsibility for Cosmopolitan's contracts with the company, the single act of advising Cosmopolitan to set off MDI/KMPL's loan repayments is sufficient to give rise to an inference of malice, given the factual allegations of Wolin's ulterior motives. It is immaterial for the sake of this inquiry that Cosmopolitan may have been incidentally benefitted by Wolin's actions. *But cf., Waldinger Corp. v. CRS Group Engineers, Inc., Clark Dietz Div.*, 775 F.2d 781, 789–90 (7th Cir.1985) (stating *in dicta* that

attorneys are "privileged to act to protect the best interests of their clients"). The attorney's interests need only be independent of Cosmopolitan's, not wholly distinct or non-overlapping, to satisfy the test for actual malice. *See Salaymeh v. InterQual, Inc.*, 108 Ill.Dec. at 583, 508 N.E.2d at 1160. There is sufficient evidence here that Wolin's interests with regard to Brown and MDI/KMPL were independent of his client's interests.

### 2. *Defendant DeNicholas' Privilege*

For a plaintiff to overcome the conditional privilege of a corporate officer he must prove that the officer induced breach to further his personal goals or injure the other party to the contract, and acted contrary to the best interests of the corporation. *George A. Fuller Co. v. Chicago Col. of Ost. Med.*, 719 F.2d 1326, 1333 (7th Cir.1983). This test differs somewhat from the "actual malice" standard of attorney privilege.[4] We find that MDI/KMPL has offered sufficient proof to raise a reasonable inference that defendant DeNicholas acted solely to further his own interests, and contrary to the best interests of Cosmopolitan.

Directors and officers of a corporation have the privilege of using their business judgment and direction on behalf of their corporation. *Stafford v. Purofied Down Products Corp.*, 801 F.Supp. 130, 136 (N.D.Ill.1992), *vacated on other grounds*, 63 F.3d 1445 (7th Cir.1995). This privilege is overcome when the officer's interests conflict with those of the corporation such that "the action is detrimental to the corporation and outside the scope of corporate authority." *Id.* 719 F.2d at 1333. *See also Mittelman v. Witous*, 135 Ill.2d 220, 142 Ill.Dec. 232, 246,

---

4. Neither the Seventh Circuit nor Illinois state courts have explicitly compared the test for attorney privilege with that of corporate officer privilege. Cases that have mentioned both privileges have done so to compare them with a third privilege, thus providing us with no real insight into the relationship between the original two. *See Waldinger Corp. v. CRS Group Engineers, Inc., Clark Dietz Div.*, 775 F.2d at 789–90 (equating attorney and corporate officer privilege in a case involving architect privilege); *George A. Fuller v. Chicago Col. of Ost. Med.*, 719 F.2d at 1333 (same). It is clear, however, that by design or

happenstance the tests have evolved differently. This difference in treatment appears to us to be justified. The attorney's code of professional responsibility differs from the corporate officer's duties of loyalty and care. It is reasonable that our courts have developed distinct bodies of law as to when attorneys, as opposed to directors of corporations, lose their conditional privilege to advise their clients to breach contracts with third parties. Regardless, we note that in this case the tests mandate identical results for similarly situated defendants.

552 N.E.2d 973, 987 (1989). Where directors and officers are found to act "solely for their own benefit or solely in order to injure the plaintiff," their privilege is lost since "such conduct is contrary to the best interests of the corporation." *Stafford v. Puro,* 63 F.3d 1436, 1442 (7th Cir.1995). MDI/KMPL argue that the setoff at issue was not in the best interests of Cosmopolitan because had the bank avoided FDIC takeover, "in the long run it would have had to explain why a payment by MDI was treated as a payment on the four participations. Such deception ... would have likely resulted in difficulty for Cosmopolitan in this instance."

These allegations, grounded not in fact but in conclusion and unsupported supposition, are insufficient in themselves to withstand a motion for summary judgment. In considering motions for summary judgment we are to ignore personal conclusions, opinions and self-serving statements by the parties and consider only facts admissible in evidence under the rules of evidence. *Certified Mechanical Contractors, Inc. v. Wight & Co., Inc.,* 162 Ill.App.3d 391, 113 Ill.Dec. 888, 895, 515 N.E.2d 1047, 1054 (1987). If anything, the setoff here furthered Cosmopolitan's interests in the short term by positively influencing the bank's balance sheet at a time when the FDIC was examining it closely. It would be impossible for us to determine at this stage the hypothetical negative effects of the setoff had the FDIC not taken over the bank, especially given the lack of evidence in the record. Nor has plaintiff made a sufficient showing that DeNicholas advised Cosmopolitan to take an action outside the scope of its corporate authority. DeNicholas is alleged to have caused Cosmopolitan to apply a portion of the March 28 payment to Brown, thus maintaining a balance owed by MDI/KMPL to Cosmopolitan. The application was not beyond the Bank's corporate authority because it was neither illegal nor in breach of contract. Indeed, the Kwiatt & Silverman demand letter, sanctioned by MDI/KMPL itself, explicitly stated that just such an action was acceptable. *See infra* Part I(B)(2) for further discussion.

Nevertheless, a defendant who acts solely to further his own personal interests is not furthering the best interests of his corporation. *See Stafford v. Puro,* 63 F.3d at 1442. The same analysis applied to Wolin *supra* is applicable here. Plaintiffs have made a sufficient showing that DeNicholas may have been acting solely out of self-interest in authorizing the application of the March 28 payment to Brown Leasing. Certainly such an action furthered the interests of Phoenix Financial, a group of investors in which DeNicholas had a significant personal stake. We find that there is a genuine issue in the record as to DeNicholas' motivation and intent, and decline to accept his contention that he was privileged to act in the manner that he did.

### B. *Count 1: Tortious Interference Claims Against Wolin*

We proceed then with MDI/KMPL's and Brown's claims against defendants, who, as stated *supra,* are vulnerable to allegations of tortious interference despite their status as Cosmopolitan's attorney and director/officer. In Illinois, a plaintiff must prove five elements to establish a claim of tortious interference with contract: (1) the existence of a valid and enforceable contract between the plaintiff and a third person; (2) the defendant's knowledge of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the third person caused by the defendant's wrongful conduct; and (5) damage to the plaintiff resulting from the breach. *Wheel Masters, Inc. v. Jiffy Metal Prod. Co.,* 955 F.2d 1126, 1129 (7th Cir.1992); *Martin v. Federal Life Ins. Co.,* 109 Ill.App.3d 596, 65 Ill.Dec. 143, 440 N.E.2d 998 (1982). Since Brown's contacts with defendants differ significantly from those of MDI/KMPL's, we must consider the claims separately.

#### 1. *Brown Leasing*

With respect to Brown Leasing's allegations, which were not brought against DeNicholas, Wolin engaged in two distinct acts, both of which constituted tortious interference according to Brown: he advised the Bank to pro rate MDI/KMPL's March 28 repayment and apply a large percentage of it

to Brown's alleged share, and he counseled the Bank to set off the application with the money allegedly owed by Brown under the four participations. Wolin argues that Brown Leasing's claim fails to meet elements three, four and five of the tortious interference test, *supra*. He claims that his role in advising Cosmopolitan to engage in the activities in question was justified because the actions were in the Bank's best interests and in compliance with Brown's own demand letter. Furthermore, he asserts that Cosmopolitan did not breach either of its contracts with Brown and, if it did, Wolin did not induce the breach. Finally, he alleges that Brown suffered no damages since it recovered all that it was owed in settling with the FDIC.

### a. *Utah Participation Agreement*

First, we address Wolin's role in Cosmopolitan's decision to grant Brown a pro rata share of MDI/KMPL's March 28 repayment. Brown's complaint and brief in response to this motion are notably silent as to the Kwiatt & Silverman letter, which threatened Cosmopolitan with litigation if the Bank *failed* to grant Brown a share of the repayment or release Brown from its obligations under the Utah participation agreement. Instead, Brown's arguments focus on the written terms of the Utah participation agreement and the course of dealing between the parties. Brown asserts that its loans to MDI/KMPL in 1991 were not part of the Utah loan, and that it had no participation interest in MDI/KMPL's repayments under that agreement, making Cosmopolitan's partial allocation of the payment to Brown wrongful. This contention is conclusory and finds no support in the record. Most notably, both deposition testimony and documents signed by Brown and its attorneys, including the Kwiatt & Silverman demand letter, indicate that Brown had a participation interest in the Utah loan at the time the March 28 repayment was made. "It is well established that a party cannot create a genuine issue of fact by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony." *Diliberti v. U.S.*, 817 F.2d 1259, 1263 (7th Cir.1987) (citations omitted).

Second, Brown emphasizes that Cosmopolitan had never shared any part of MDI/KMPL's prior repayments with Brown Leasing, and argues that this "pattern" of performance waived the Bank's unilateral right to grant Brown a share. Brown cites several cases that support the general proposition that contracts can be modified by the course of performance and conduct of the parties, and that a party's failure to exercise a known contract right waives the right when the contract contains no "discretionary" or "nonwaiver" clauses. *See Martz v. MacMurray College*, 255 Ill.App.3d 749, 194 Ill.Dec. 491, 627 N.E.2d 1133 (1993); *National Cleaning Contractors Inc. v. Montauk Co.*, 1990 WL 43356, *6 (N.D.Ill.1990). Here, Brown contends that the Utah participation agreement's written terms were modified over time to reflect Cosmopolitan's practice of being "first in and first out," a provision which the Bank allegedly breached when it applied the March 28 payment to Brown prior to extinguishing its own share.

This argument is not compelling. It is clear from the record that Cosmopolitan's decision to grant Brown a pro rata share of the MDI/KMPL repayment was *not* unilateral. Brown's own attorneys, at the behest and with the backing of Brown, unequivocally stated in the Kwiatt & Silverman demand letter that such an action was not only acceptable, but compulsory. We are hardpressed to understand how Cosmopolitan's compliance with Brown's own demand could make the Bank's attorney vulnerable to a claim of tortious interference with contract, a claim which cannot proceed unless the underlying contract has been breached. Even assuming, however, that Cosmopolitan's actions did breach the Utah participation agreement, Wolin's advice was justified by Brown's demands. If we are to accept that the participation agreement was indeed modified by course of conduct, the Kwiatt & Silverman letter, which Wolin received and read prior to advising his client, placed him in a difficult position. He was forced to advise Cosmopolitan either to grant Brown a pro rata share, complying with the demands in the letter but breaching the modified participation agreement, or to withhold the money from Brown,

complying with the contract but putting the Bank at risk of suit for ignoring the letter.[5] We cannot sanction Brown's benefitting from a "catch-22" which it set in motion. Wolin's "interference" would have been justified regardless of which route he chose, since both served the interests of Cosmopolitan by avoiding a path that threatened to lead to litigation. Thus, Wolin did not tortiously interfere with the Utah participation agreement.

### b. *The Four Participations*

■ We are left then with Wolin's involvement in the setoff of Brown's four participations obligations. Again, Wolin focuses on elements three, four and five of the *Wheel Masters* test, *supra*. He first asserts that Cosmopolitan did not breach the four participations contract when it engaged in the setoff, arguing that Cosmopolitan was entitled to set off the debt it owed Brown under the Utah participation agreement because there was a debt due and owing under the four participations. This debt allegedly arose when Brown failed to share with Cosmopolitan moneys received from one of the notes of the four participations.

But "equitable setoff was conceived as a limited remedy, and is available only where the debts are mutual, mature, and 'of such a certain and ascertainable character as to be capable of being applied in compensation of each other' without the intervention of the court to estimate them." *Bank of Chicago–Garfield Ridge v. Park Nat. Bank,* 237 Ill. App.3d 1085, 179 Ill.Dec. 240, 244, 606 N.E.2d 72, 76 (1992) (quoting *Faber, Coe & Gregg v. First Nat. Bank of Chicago,* 107 Ill.App.2d 204, 246 N.E.2d 96 (1969)). Since "debts arising at different times out of different circumstances are not mutual," the setoff here was not appropriate. *Soo Line R. Co. v. Escanaba & Lake Superior R. Co.,* 840 F.2d 546, 551 (7th Cir.1988). There is no dispute that the Utah participation agreement and the four participations involved different matters, different funds, and were not entered into simultaneously. Further-

more, neither the terms of the contracts nor any separate agreement between the parties authorized Cosmopolitan to engage in a setoff. *See Selcke v. New England Ins. Co.,* 995 F.2d 688, 690 (7th Cir.1993) (self-help remedy of setoff is not available to a party to a contract without an express provision in the contract which allows it).

■ In addition, it is doubtful whether Brown's alleged debts under the four participations were mature. Where, as here, a debt's maturity is the subject of a good-faith dispute, a creditor's unilateral, self-help remedy of setoff is improper. *See Bank of Chicago–Garfield Ridge v. Park Nat. Bank,* 179 Ill.Dec. at 244, 606 N.E.2d at 76 (parties were litigating the dispute when defendant set off the debt). Wolin argues that Cosmopolitan's alleged breach of its duties as guarantor of the Cosentino loan caused Brown to repudiate its obligations under the four participations. The dispute over the guaranty agreement, then the subject of litigation between the parties, did not justify Cosmopolitan's setoff of Brown's funds. "Indeed, self-help in the business world, where one party seizes assets that belong to another, in order to improve its bargaining position concerning a genuinely disputed sum—is presumptively tortious." *Soo Line R. Co. v. Escanaba & Lake Superior R. Co.,* 840 F.2d at 551.

Wolin has offered little to offset this presumption. He alleges that prior to the setoff Brown received payments under one or two of the four notes underlying the four participations—payments which it failed to share with Cosmopolitan. Brown's books seem to validate these allegations. Nevertheless, Brown's debts under the four participations totalled at most $325,000 and involved only two of the four notes. Wolin's contention that this debt authorized Cosmopolitan to set off over $700,000, extinguishing three of the four notes and partially extinguishing the fourth, is an attenuated argument at best. Furthermore, Brown contests the allegation that it received payments under the notes at all, a contention that admittedly belies its

---

**5.** The second "option" afforded by the Kwiatt & Silverman letter was not a solution to Wolin's dilemma. If he had advised Cosmopolitan to exercise it, and the Bank had done so, Brown would have been released from all obligations under the Utah participation agreement. This option clearly would not have been in the best interests of Cosmopolitan either.

own bookkeeping but may raise enough dispute to warrant a conclusion that the debt was not mature. We need not reach such a decision here, however, since our finding that the Utah participation agreement and the four participations were not mutual contracts is alone sufficient to find the setoff improper.

■ Wolin argues in the alternative that the setoff was a valid rescission remedy for Brown's repudiation of the four participations. We find no authority, however, to support Wolin's implied assertion that the standard for self-help setoff in traditional breach cases, enumerated *supra*, differs from that of self-help setoff in repudiation cases.[6] If setoff was improper for Brown's alleged breach, as we have concluded, it was also improper for Brown's alleged repudiation. We need not address whether Brown in fact repudiated the contract or whether that repudiation was justifiable, for even if there was an unjustified repudiatory breach here, Cosmopolitan was not entitled to the self-help remedy of setoff.

■ Similarly, Wolin's contention that his advice to Cosmopolitan to engage in the setoff was justified is without merit. An attorney's advice to his client is justified for the purposes of tortious interference claims if it is grounded in the applicable law or a good-faith argument to extend the law.[7] *See R.J.N. Corp. v. Connelly Food Products, Inc.*, 175 Ill.App.3d 655, 125 Ill.Dec. 108, 114, 529 N.E.2d 1184, 1190 (1988) ("lack of legal justification for inducing the breach is an essential element in stating a cause of action for tortious interference with contractual relations"). Neither is present here. The self-help remedy of setoff is only available if the conditions of mutuality, maturity and liquidated damages are present. Here at least

one of these conditions was not met. *See supra.*

Nor are we persuaded that Wolin's advice was intended to be a good-faith argument to extend the law. The record indicates that Wolin conducted no legal research before advising Cosmopolitan that setting off MDI/KMPL's payment was legal. Furthermore, although Wolin apparently did consult with two other attorneys about the matter, there is genuine dispute in the record whether these consultations were indeed efforts to determine the legality of the setoff or, instead, related to the potential implications of the setoff for Phoenix Financial. Based on this evidence we cannot conclude that Wolin's advice was justified as a matter of law.

We turn next to Wolin's contention that he did not induce Cosmopolitan's breach of the four participations. A plaintiff must make a showing sufficient to establish any essential element for which he will bear the burden of proof at trial, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), and inducement is a necessary element under Illinois law of tortious interference. *See Wheel Masters, supra.* Inducement is found when " 'the injured party ... show[s] that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct.' " *R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 826 F.2d 678, 686 (7th Cir.1987) (quoting Restatement (Second) of Torts § 767 (1979)). The record is relatively sparse on this issue. Brown refers us to conclusory statements made by the President of MDI/KMPL, Brown's co-plaintiff in this litigation, as evidentiary support for the contention that Wolin induced Cosmopolitan to act in the manner that it did. Unauthenticated bank docu-

---

**6.** Setoff is, of course, a recognized rescission remedy when the parties adjudicate the matter in court, for "inherent in the remedy ... is the return of the parties to their proper precontract positions." *Puskar v. Hughes*, 179 Ill.App.3d 522, 127 Ill.Dec. 880, 885, 533 N.E.2d 962, 967 (1989). *See also Downes Swimming Pool, Inc. v. North Shore Nat. Bank*, 124 Ill.App.3d 457, 79 Ill.Dec. 857, 861, 464 N.E.2d 761, 765 (1984). Nevertheless, rescission does not require a court to grant restitution "for benefits allegedly conferred under a separate and unrelated transac-

tion." *Puskar v. Hughes*, 127 Ill.Dec. at 886, 533 N.E.2d at 968.

**7.** A threat or demand by the other party to the contract, such as the Kwiatt & Silverman letter here, may also provide an attorney with ample justification for advising a client to engage in a particular action. There is no serious contention here, however, that the Kwiatt & Silverman letter demanded, authorized or acceded to Cosmopolitan's setoff.

ments are also referenced as evidence of Wolin's role in the decision to engage in the setoff. These items of inadmissible and/or self-serving evidence are insufficient to avoid summary judgment.

Brown's final argument, however, is compelling. He contends that Wolin's involvement in Phoenix Financial gives rise to a reasonable inference that Wolin was motivated to induce the setoff. We agree with Brown that such an inference, in combination with the undisputed fact that Wolin in fact did advise Cosmopolitan to perform the setoff, is sufficient to raise a genuine issue of material fact as to whether Wolin's actions constituted inducement. Wolin argues that he could not have induced the setoff because an officer of the bank, co-defendant McLaughlin, had already conceived of the idea when he solicited Wolin for legal advice. Inducement, however, does not require the defendant to be the originator of an idea or give unsolicited advice. Rather, it contemplates a defendant whose actions are intended to be and indeed are an element in a third party's decision to breach a contract. *See id.* (defendant must be shown to have intended to induce a breach, not simply to have acted in a manner which would inevitably lead to one). It is reasonable to infer that when Wolin incorrectly assured Cosmopolitan's decisionmakers that the setoff was legal, the advice was a critical element in their decision, especially given his central role in handling Cosmopolitan's contracts with Brown. Furthermore, Wolin's outside interest in Phoenix provided him with ample motivation to induce Cosmopolitan to breach the four participations. This is a sufficient showing of inducement.

Finally, Wolin argues that Brown suffered no damages from the setoff since Brown's obligation to repay Cosmopolitan for its $1.95 million loan under the four participations was released by the FDIC, permitting Brown to retain future payments from the underlying notemakers. Wolin also asserts that since Brown never shared the $325,000 payment with Cosmopolitan, as mandated by the four

participations, it was able to enjoy the money unhampered. These arguments are not convincing. Wolin seems to characterize the $1.95 million provided by Cosmopolitan under the four participations as a windfall to Brown. The record indicates, however, that at the direction of Cosmopolitan, Brown immediately took the money and loaned it to Mr. Cosentino, who subsequently defaulted on it. Brown thus enjoyed no benefit from the money. Furthermore, there is no evidence that Brown has received any payments from the underlying notemakers since the FDIC's release, or expects to in the future. Nor do we feel that these considerations are particularly relevant. The setoff took money from Brown that Wolin himself asserts was Brown's authorized share under the Utah participation agreement. As we noted earlier, the amount that was set off was significantly greater than the amount Brown allegedly withheld from Cosmopolitan under the underlying notes. Thus, even if Brown wrongfully failed to share repayments under the notes, the setoff overcompensated for the deficiency. Wolin asserts that MDI/KMPL eventually paid Brown in full for its contributions under the Utah participation agreement. Brown disputes this contention, pointing out that it has initiated litigation against MDI/KMPL for money still owing. We agree that there is a genuine issue of material fact as to the extent and nature of damages suffered by Brown.[8]

In sum, Brown Leasing's showing with regard to the setoff of the four participations withstands Wolin's motion for summary judgment.

### 2. *MDI/KMPL*

MDI/KMPL's claims of tortious interference against Wolin and DeNicholas are grounded in Cosmopolitan's alleged breach of the Utah loan agreement. Plaintiffs claim that the $858,000 payment to Cosmopolitan extinguished their debt to Cosmopolitan, and that the Bank's assignment of most of that payment to Brown's share, which according to plaintiffs never existed, was contrary to

---

**8.** We also decline to adopt Wolin's argument that Brown's settlement with the FDIC bars its claims here. Wolin's brief at 22. Since Wolin was not specifically released by the settlement, and he is being sued here for actions outside the scope of the agreement, he has not made a showing sufficient to warrant summary judgment on this ground.

the parties' course of dealing. Since their debt was allegedly extinguished by the March 28 payment, MDI/KMPL claim that the collateral securing the Utah loan was wrongfully withheld by the Bank from that date forward. We find that there are no genuine issues of material fact that would compel us to deny Wolin's and DeNicholas' motions for summary judgment against MDI/KMPL. Plaintiffs have produced no evidence to substantiate two elements of their tortious interference claim: (1) that defendants' advice to Cosmopolitan regarding the application of the March 28 repayment to Brown was unjustified; and (2) that Cosmopolitan breached the Utah loan agreement.

### a. *Defendants' Actions Were Justified*

 If Wolin's and DeNicholas' actions were justified, plaintiffs cannot maintain a tortious interference claim against them. *See Wheel Masters, supra.* Wolin and DeNicholas argue that the Kwiatt & Silverman letter justified their behavior. Although the demand letter stated that it was written on behalf of MDI, plaintiffs assert that Kwiatt & Silverman was not representing MDI or KMPL when the letter was sent or at any time prior to or subsequent to its mailing. Nevertheless, Mark Kaplan, MDI's president, indicated in deposition testimony that he knew about the letter and assented to it. Kaplan admitted that he allowed Terry Brown, president of Brown Leasing, to take control of how the payment was to be allocated. This evidence is uncontradicted except for conclusory remarks in plaintiffs' brief and accompanying affidavit. Thus, MDI/KMPL arguably waived its right to object to Cosmopolitan's application when it assented to the mailing of the Kwiatt & Silverman demand letter.

In addition, the record contains no evidence that Wolin or DeNicholas knew, or had reason to suspect, that Kwiatt & Silverman was not authorized to act for MDI/KMPL. Wolin had had few previous dealings with MDI/KMPL, and he well may have believed that the firm represented them with regard to the repayment of the Utah loan. New attorneys are hired and fired by parties at all points during the course of performance of a contract, and opposing counsel need not confirm the authenticity of new representation as long as their belief that the representation is valid is reasonable. Plaintiffs contend that defendants should have realized that Kwiatt's representation of MDI/KMPL was improbable, since the firm could not have represented both Brown and MDI/KMPL without encountering a conflict of interest. We decline to accept this reasoning. An attorney should not be compelled, at the risk of a suit for tortious interference, to conduct a conflicts check on behalf of its opposing counsel. The same can be said with regard to corporate officers. MDI/KMPL admits in deposition testimony to knowing the contents of the letter and the fact that it was mailed to Cosmopolitan. If it expected Wolin and DeNicholas to disregard it, or to conclude that it was *not* sent on behalf of MDI/KMPL as the letter stated, MDI/KMPL promptly should have contacted them and instructed them accordingly. Its failure to do so lends support to the conclusion that Wolin's and DeNicholas' actions were justified.

Plaintiffs contend in the alternative that Cosmopolitan's application of part of the repayment to Brown did not comply with the demand letter. With respect to the only contract at issue in MDI/KMPL's claims, the Utah loan agreement, we disagree with this assertion. The letter demanded that Cosmopolitan pro rate MDI/KMPL's payment pursuant to the Utah loan and grant a share to Brown consistent with the Utah participation agreement, or, in the alternative, use the payment solely for the extinguishment of Cosmopolitan's share of the loan. Cosmopolitan, in compliance with Wolin's and DeNicholas' counsel, exercised the former option. Plaintiffs argue that Cosmopolitan's decision to set off Brown's share rather than actually "pay" Brown disregarded the intent and purpose of the demand letter. This argument is unavailing because the setoff is irrelevant to MDI/KMPL's claims. The only contract at issue with regard to MDI/KMPL's tortious interference count is the Utah loan agreement, which is unrelated to the setoff. Cosmopolitan's decision to apply a pro rata share of MDI/KMPL's payment to Brown complied with the demand letter, and justified defendants' actions.

#### b. *No Breach of Contract*

■ Nor do we adopt plaintiffs' argument that the application of the pro rata share was in breach of the Utah loan agreement. Plaintiffs contend that since the money loaned by Brown to MDI/KMPL was not part of the Utah loan, there was no outstanding debt after the March 28 payment. As stated previously, this contention is not compelling given the uncontroverted testimony and signed documents of Brown's own officers characterizing the Brown payments as part of the Utah loan. Thus, after the payment, there was still money outstanding under the Utah loan, approximately $.7 million of which was owed to Cosmopolitan and the remainder to Brown. Plaintiffs' contention that Brown and MDI/KMPL had made separate arrangements for the repayment of the loans between them, and that MDI/KMPL had indeed made the repayments prior to March 28, 1991, is not convincing. There is no evidence that Wolin or Cosmopolitan knew about such arrangements at the time the decision to apply a portion of the payment to Brown was made. Nor has plaintiff presented evidence that the Brown loans were in fact repaid as of March 28.

Furthermore, under the Utah loan agreement all payments in satisfaction of the loan were to be made to Cosmopolitan. Nothing in the contract indicated that future participants in the loan, such as Brown, were to be paid separately. The collateral securing the loan was not to be returned by Cosmopolitan until *all* the money under the loan had been repaid. With regard to the collateral, then, it is immaterial whether or not Cosmopolitan's share of the loan had been fully repaid. If there was *any* outstanding balance, as there was here, return of the collateral was not mandated. Even if Cosmopolitan had applied the entire March 28 payment to its own loans and extinguished MDI/KMPL's debt to the Bank, it would not have been compelled under the terms of the contract to return the collateral since there was still money outstanding under the Utah loan.

Plaintiffs argue that the parties' course of dealing was to extinguish Cosmopolitan's share prior to satisfying the loans of any participants, thus modifying the written contract. Even if we were to accept this argument, however, it does not alter the fact that the return of the collateral was not contingent on the extinguishment of Cosmopolitan's share. It is not contended that this aspect of the Utah loan agreement was modified by course of dealing. Furthermore, the record is devoid of evidence of a separate written or oral understanding between the parties about how and under what circumstances the collateral was to be released. Only the written contract speaks to this issue. Thus, even if Cosmopolitan's share was extinguished by the March 28 payment, Cosmopolitan did not breach the Utah loan agreement, or any modification thereof, by refusing to release the collateral. Without breach of contract there can be no action for tortious interference, and summary judgment for Wolin and DeNicholas is proper here.

### II. *Counts III and VII: Scheme to Defraud*

■ Wolin and DeNicholas also move for summary judgment on plaintiffs' claims of fraud. Under Illinois law fraud occurs where a defendant makes a false representation of material fact which the defendant knows is false, the defendant intends that the plaintiff rely on this false representation, and the plaintiff reasonably relies on it, thus sustaining damage. *Dresser Indus., Inc. v. Pyrrhus AG*, 936 F.2d 921, 934 (7th Cir.1991); *In re Witt*, 145 Ill.2d 380, 164 Ill.Dec. 610, 615, 583 N.E.2d 526, 531 (1991). A fraudulent representation may be made by words or by actions, or other conduct amounting to a statement of fact. *Glazewski v. Coronet Ins. Co.*, 108 Ill.2d 243, 91 Ill.Dec. 628, 631, 483 N.E.2d 1263, 1266 (1985). The intentional concealment of a material fact is the equivalent of a false statement of material fact. *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill.App.3d 154, 109 Ill.Dec. 541, 545, 510 N.E.2d 409, 413 (1986). We grant both Wolin and DeNicholas summary judgment with respect to plaintiffs' fraud claims.

#### a. *MDI/KMPL's Fraud Claims*

■ MDI/KMPL contend that defendants failed to inform them that their March 28 payment would be applied in a manner

that was inconsistent with the parties' course of dealing. MDI/KMPL's alleged reliance was based solely on prior dealings between the parties, not on any affirmative statements or promises by Wolin or DeNicholas. Plaintiffs claim that if they had known that the March 28 payment was to be applied in part to Brown and that their debt to Cosmopolitan was not to be extinguished, they would not have remitted the payment at all. It is evident, however, that MDI/KMPL were aware that Cosmopolitan might apply the payment to Brown's share. Brown had warned MDI/KMPL several months earlier of Cosmopolitan's propensity to engage in the very activity which occurred here. Brown told Kaplan, MDI's president, in December 1990, that Brown would not be paying any more money to Cosmopolitan on the four participations and that Kaplan should start paying Brown directly on the Brown portion of the Utah loan. Brown was concerned that if the Bank was given money under the Utah loan, it would use it to set off Brown's debts under the four participations instead of releasing it to Brown. Given this warning, it is questionable whether the Bank's actions on March 28 were contrary to MDI/KMPL's reasonable expectations. A plaintiff must reasonably rely on defendants' false representations to state a cause of action for fraud. *See Dresser, supra.*

■ We need not rely on this ground to find for the defendants here, however. MDI/KMPL claim that they were defrauded into making the March 28 payment by defendants' failure to disclose Cosmopolitan's planned application. But " 'one suffers no damage where he is fraudulently induced to do something which he is under legal obligation to do, such as pay a just debt . . . .' " *Sinclair v. State Bank of Jerseyville,* 207 Ill.App.3d 430, 152 Ill.Dec. 516, 518, 566 N.E.2d 44, 46 (1991) (quoting 37 AmJur.2d *Fraud and Deceit* § 295, at 392–93 (1968)). This rule applies even where the plaintiff might have benefitted by nonperformance. *See id.,* 152 Ill.Dec. at 519, 566 N.E.2d at 47. Thus, even if we were to assume that defendants' fraudulent behavior induced plaintiffs to remit money which they would have preferred to retain, MDI/KMPL cannot escape the fact that it was under a legal obligation

to repay the Utah loan. There is no genuine issue in the record that on March 28, 1991, MDI/KMPL owed less than $858,000 to Cosmopolitan and Brown under the Utah loan. Nor is it disputed that under the terms of the Utah loan all payments were to be made to Cosmopolitan. By remitting $858,000 to Cosmopolitan on that date, MDI/KMPL was doing only what it was required to do under the Utah loan agreement. This consideration makes questions of Cosmopolitan's subsequent actions largely irrelevant for the sake of MDI/KMPL's fraud claim. There *is* no claim when the plaintiff is induced to do something it was already obligated to do.

#### b. *Brown Leasing's Fraud Claim*

■ With respect to Brown's allegations of fraud against Wolin, we look first to the Kwiatt & Silverman demand letter. The letter, written a full week before Cosmopolitan's reversal of its bookkeeping entry and subsequent setoff, demanded that Cosmopolitan apply a portion of the March 28 payment to Brown. There is no dispute that Brown knew that its attorneys were sending the letter and had pre-approved its contents. Indeed, the letter was written at Brown's direction. Thus, there can be no serious contention that Brown was taken by surprise by Cosmopolitan's decision to apply a portion of the payment to Brown. Without reliance there is no fraud. With respect to Cosmopolitan's setoff, which was not demanded in the Kwiatt & Silverman letter, Brown has made no allegations of inducement or reasonable reliance. Indeed, it is unclear to us what actions Brown possibly could have been induced to take in reliance on representations by defendants. The setoff may very well have been inappropriate and illegal, but it was not contrary to Brown's expectations based on defendants' representations. In fact, Brown's president told Kaplan in December 1990 that he suspected Cosmopolitan might engage in exactly the kind of setoff that occurred in March 1991. There are no allegations that Cosmopolitan represented to Brown that it planned to do something other than what it did. Thus, there was no fraud as to either contract between Cosmopolitan and Brown.

### III. *Counts IV and VIII: Conversion*

MDI/KMPL and Brown allege in Counts IV and VIII of the complaint that Cosmopolitan's application of $718,000 of the March 28 payment to Brown, and its subsequent setoff of that amount, constituted conversion. Wolin and DeNicholas move for summary judgment on plaintiffs' claims. We grant defendants' motions.

 "The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held." *General Motors Corp. v. Douglass*, 206 Ill.App.3d 881, 151 Ill.Dec. 822, 825, 565 N.E.2d 93, 96 (1990) (citing *In re Thebus*, 108 Ill.2d 255, 91 Ill.Dec. 623, 625, 483 N.E.2d 1258, 1260 (1985)). To succeed on a claim of conversion, plaintiffs must prove: (1) an unauthorized and wrongful assumption of control, dominion, or ownership by defendants over plaintiff's personalty; (2) plaintiff's right in the property; (3) plaintiff's right to the immediate possession of the property, absolutely and unconditionally; and (4) a demand for possession of the property. *Id.* 151 Ill.Dec. at 825–26, 565 N.E.2d at 96–97. MDI/KMPL have failed to fulfill the first part of this test. Both the Kwiatt & Silverman demand letter and the Utah loan agreement authorized Cosmopolitan to apply the March 28 payment to Brown's share. *See supra.* MDI/KMPL's claims thus do not withstand summary judgment.[9]

 Brown's ability to maintain a conversion action against Wolin for Cosmopolitan's setoff of the $718,000 is a more difficult question. We have concluded that the setoff was not authorized by contract, the Kwiatt & Silverman letter, or the law. Wolin contends, however, that since the setoff involved a debt—Brown's allegedly unpaid obligations under the four participations—it cannot be the basis for a conversion claim. *See* fn. 8,

*supra.* We disagree. While Wolin has accurately stated the general rule with regard to debt, conversion may be actionable nonetheless in cases where the contract or the legal responsibilities of the defendant require that the money be deposited in a special account. *See In re Thebus*, 91 Ill.Dec. at 626, 483 N.E.2d at 1261 (noting that where an attorney is charged with conversion, Rule 9–102 of the Code of Professional Responsibility mandates a different analysis than the typical debt case). Indeed, although "the general rule is that conversion will not lie for money represented by a general debt or obligation," Illinois courts have found that payments to a defendant of specific, identifiable amounts, kept separate from a general fund, can constitute conversion. *See id.; Addante v. Pompilio*, 303 Ill.App. 172, 25 N.E.2d 123 (1940) (complaint stated cause of action for conversion where defendant failed to transmit a specific amount of money given to him by plaintiff to a third party); *Grand Pacific Hotel Co. v. Rowland*, 88 Ill.App. 519 (1899) (waiter who disappeared with a $500 bank note given to him by plaintiff in satisfaction of his dinner check could be sued for conversion).

 Thus, the rule for the conversion of debt mirrors that of the conversion of money in general: "[m]oney may be the subject of conversion, but it must be capable of being described as a specific chattel." *In re Thebus*, 91 Ill.Dec. at 625, 483 N.E.2d at 1260. A plaintiff must show that "the money claimed, or its equivalent, at all times belonged to plaintiff and that the defendant converted it to his own use." *General Motors Corp. v. Douglass*, 151 Ill.Dec. at 827, 565 N.E.2d at 98. *See also Sandy Creek Condominium Association v. Stolt & Egner, Inc.*, 267 Ill.App.3d 291, 204 Ill.Dec. 709, 713, 642 N.E.2d 171, 175 (1994). Here, Wolin

---

9. As further grounds for dismissal, defendants note that MDI/KMPL's conversion claim is based on Cosmopolitan's application of a debt. Debt is the type of intangible property that is generally inappropriate subject matter for conversion claims. *See Securities Fund Ser., Inc. v. American Nat'l Bank & Tr. Co.*, 542 F.Supp. 323, 328 (N.D.Ill.1982); *General Motors Corp. v. Douglass*, 151 Ill.Dec. at 827, 565 N.E.2d at 98; *In re Thebus*, 91 Ill.Dec. at 625–26, 483 N.E.2d at 1260–61. Nevertheless, where the money withheld to fulfill a debt is specific and identifiable, as it may have been here, a conversion claim based on a debt is actionable. *See General Motors Corp. v. Douglass*, 151 Ill.Dec. at 827, 565 N.E.2d at 98. Since plaintiffs have made no showing in this regard, we adopt defendants' argument as an alternate ground for granting summary judgment. *See infra.*

himself insists that the reason Cosmopolitan was authorized to apply the payment to Brown in the first place was because the money was rightfully Brown's under the Utah participation agreement. Cosmopolitan, by its own admission, acted merely as the middleman between MDI/KMPL and Brown Leasing for debts between them under the Utah loan. Once Cosmopolitan decided to apply $718,000 of the March 28 payment to Brown, the money was Brown's, and the setoff converted the money to Cosmopolitan's own use.

Unfortunately for Brown, the record is devoid of evidence of the method by which Cosmopolitan held the March 28 payment prior to engaging in the setoff. We are unable to determine whether the Bank kept the funds in question segregated in a separate account, as we must in order to permit plaintiff to maintain its conversion claim. *See Eggert v. Weisz*, 839 F.2d 1261, 1265 (7th Cir.1988); *General Motors v. Douglass*, 151 Ill.Dec. at 827, 565 N.E.2d at 98; *In re Thebus*, 91 Ill.Dec. at 626, 483 N.E.2d at 1261 (money must be specific and identifiable). All we know is that one week after receiving the payment the Bank reversed its book-keeping entry, applying $718,000 to Brown and setting-off that amount against the four participations. The funds could easily have been deposited into the general funds of the Bank in the interim. Since plaintiff has failed to allege any facts upon which we could reasonably infer that the March 28 payment was segregated from Cosmopolitan's general funds, we are compelled to grant Wolin summary judgment on Count IV. *See Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552.

## IV. Count II: Violation of 12 U.S.C. § 503 and 18 U.S.C. § 1005

█ Finally, defendant DeNicholas moves for summary judgment on MDI/KMPL's claim under 12 U.S.C. § 503 for his alleged violation of 18 U.S.C. § 1005.[10] In the complaint, plaintiffs allege that DeNicholas and his co-defendants schemed to falsify Cosmopolitan's books and records so as to defraud plaintiffs and the FDIC, resulting in significant monetary damages. MDI/KMPL's brief narrows this allegation by focusing on DeNicholas' alleged misrepresentations to plaintiffs and to Cosmopolitan's board that the March 28 payment would be

---

**10.** 12 U.S.C. § 503 codifies officer and director liability for violations of 18 U.S.C. § 1005, which is triggered by a bank's wilful failure to record details of its financial condition in its official bank records, including books or statements. Only "member banks" of the federal reserve system are governed by these sections.

12 U.S.C. § 503 states:

**§ 503. Liability of directors and officers of member banks**

If the directors and officers of any member bank shall knowingly violate or permit any of the agents, officers, or directors of any member bank to violate any of the provisions of sections 375, 375a, 375b, and 376 of this title or regulations of the board made under authority thereof, or any of the provisions of sections 212, 213, 214, 215, 655, 1005, 1014, 1906, 1909 of Title 18, every director and officer participating in or assenting to such violation shall be held liable in his personal and individual capacity for all damages which the member bank, its shareholders, or any other persons shall have sustained in consequence of such violation.

18 U.S.C. § 1005 reads, in pertinent part:

**§ 1005. Bank entries, reports and transactions**

Whoever, being an officer, director, agent or employee of any Federal Reserve bank, member bank, depository institution holding company, national bank, insured bank, branch or agency of a foreign bank, or organization operating under section 25 or section 25(a) of the Federal Reserve Act, without authority from the directors of such bank or company, branch, agency, or organization, issues or puts in circulation any notes of such bank or company, branch, agency, or organization; or

Whoever, without such authority, makes, draws, issues, puts forth, or assigns any certificate of deposit, draft, order, bill of exchange, acceptance, note, debenture, bond, or other obligation, or mortgage, judgment or decree; or

Whoever makes any false entry in any book, report, or statement of such bank, company, branch, agency, or organization with intent to injure or defraud such bank, company, branch, agency, or organization, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System; ... shall be fined....

credited solely to Cosmopolitan's share of the Utah loan. Defendant DeNicholas argues that such behavior, even if it were true, would not subject him to liability under §§ 503/1005 since plaintiffs have not shown that they relied on any bank records, only the representations of Cosmopolitan's officers. We agree with DeNicholas and grant him summary judgment.

Until 1994, the Seventh Circuit had not addressed whether § 503 of the Federal Reserve Act ("FRA") requires a showing of reliance by the plaintiff and, if it does, on what plaintiffs must show they relied. But in *Brown Leasing Co. v. Cosmopolitan Bancorp, Inc.*, a case which incidentally involved many of the same parties to the conflict here, it was held that a plaintiff's reliance upon a bank's books or reports is a necessary element of a cause of action under §§ 503/1005. 42 F.3d 1112, 1116 (7th Cir.1994). Despite MDI/KMPL's arguments to the contrary, we find that the *Brown Leasing* ruling applies and controls in this case.

In *Brown Leasing,* DeNicholas and defendant Vercillo were sued by Brown for allegedly inducing Cosmopolitan to refuse to honor its Guaranty of the Cosentino loan. The district court refused to allow Brown to amend its complaint in order to add a § 503 claim, since there was no allegation that Brown had relied on the Bank's misleading records. In upholding the district court's ruling, the Seventh Circuit held that plaintiffs must rely on bank books or reports in order to state a claim under §§ 503/1005, noting the parallel language in these sections of the FRA and § 93(a) of the National Bank Act. *Id.* (the entire causation requirement of § 93(a) was adopted for the FRA analysis). Thus, a plaintiff's reliance on official bank statements—books or reports in the case of §§ 503/1005 actions and reports filed with the Comptroller of the Currency in the case of §§ 93/161 actions—"is a necessary element of a cause of action under [either statute]." *Id.* However, "reliance on directors' actions is not and was never intended to be" a viable substitute for such a showing. *Id.* at 1116.

Here, MDI/KMPL have attempted to tailor their § 503 claim to conform to the requirements of *Brown.* They claim that DeNicholas and Vercillo "knowingly allowed Cosmopolitan to document and administer the Utah Loan to reflect Cosmopolitan's advances to be 'first out.'" Plaintiff's brief at 9. Furthermore, and more importantly for the § 503 claim, they allege that board minutes were issued by Cosmopolitan reflecting the Bank's intention to be first out of the loan. Citing their reliance on defendants' representations, and a case indicating that board minutes constitute official bank records sufficient to invoke the FRA, MDI/KMPL claim that their claim withstands summary judgment.

We disagree. The statute clearly requires a plaintiff to rely on official bank records. Here, plaintiffs admit that they never reviewed Cosmopolitan's Board minutes prior to remitting the March 28 payment. It is not sufficient to simply allege that directors of the Bank told them orally what the Bank had decided at the meeting. Reliance on the minutes themselves is required.[11] No claim under §§ 503/1005 can be maintained if plaintiff admits that it never even read the official bank statement upon which it purportedly relied. We grant DeNicholas summary judgment.

### CONCLUSION

Defendant Wolin's motions for summary judgment are granted as to Counts III and IV, and as to that portion of Count I that comprises plaintiff MDI/KMPL's claims. His motion is denied as to the portion of Count I that comprises plaintiff Brown Leasing's claims. Defendant DeNicholas' motion for summary judgment is granted.

---

**11.** We decline to state an opinion here as to whether Board minutes are indeed contemplated to be official bank records under §§ 503/1005. Such a ruling is not necessary to reach a decision on the issue.