BANK OF CHICAGO-GARFIELD RIDGE, f/k/a Garfield Ridge Trust and Savings Bank, Plaintiff-Appellant, v. PARK NATIONAL BANK, Defendant-Appellee.

First District (2nd Division)    No. 1—91—3096

Opinion filed September 22, 1992.—Rehearing denied January 7, 1993.

---

1086

Holleb & Coff, of Chicago (Paul T. Fox, Lori A. Goldstein, and Stuart N. Rappaport, of counsel), for appellant.

Jones, Day, Reavis & Pogue, of Chicago (James R. Daly, Irene Savanis, and Nancy A. Tanck, of counsel), for appellee.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

This is an appeal pursuant to a Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)) certification. Plaintiff, Bank of Chicago-Garfield Ridge (Garfield), brought suit in chancery against defendant, Park National Bank (Park), for damages and other relief arising from the alleged breach of a loan participation agreement. During the pendency of this suit, Garfield repurchased Park's interest in an unrelated loan participation and set off amounts claimed in the suit against the proceeds due Park from this repurchase. Garfield then sought a declaration that the setoff was valid.

Park moved for summary judgment challenging Garfield's right to set off the proceeds of the unrelated loan participation. Park's motion for summary judgment was allowed. Garfield appeals, contending that the circuit court erred (1) in holding the setoff invalid; and (2) in determining that declaratory judgment was an improper procedural means by which to determine the validity of a setoff, and then proceeding to rule against Garfield on the merits of the summary judgment based upon this perceived impropriety.

On April 30, 1990, Garfield filed an eight-count chancery complaint against Park, alleging in general the following. Pursuant to an established lending relationship, Park advanced Evron Industries, Inc. (Evron), two loans: $1 million, evidenced by a promissory note dated September 18, 1987; and $400,000, evidenced by an April 20, 1988, note. Both loans were secured with specific Evron assets. On October 15, 1988, Park's senior vice-president, Sheldon

Bernstein, proposed to Garfield's vice-president, Marc Holland, that Garfield participate in either or both loans for "up to one year." Garfield responded with a counteroffer, setting forth as conditions that: (a) Garfield's participation be limited to a period of 120 days; (b) the funds advanced to Evron by Park be limited to the sum of 75% of Evron's accounts receivable which were less than 90 days old, plus 25% of the book value of Evron's inventory; and (c) Park's right to be paid from proceeds of Evron collateral in the event of default be subordinate to that of Garfield.

Park allegedly agreed to these additional terms, resulting in the "Evron participation." The participation agreement was embodied in two separate documents dated November 4, 1988, namely, the participation certificate (certificate), and a letter from Bernstein to Holland (Bernstein letter). The Bernstein letter provided as follows:

"Re: Participation in loans to Evron Industries [Park] agrees that future advances to Evron Industries will not exceed the total of 75% of their receivables due within 90 days plus 25% of their inventory. In addition, [Park] subordinates its position on the collateral pledged to secure this loan to [Garfield]. This participation will expire on March 3, 1989."

Garfield alleged that on February 28, 1990, Evron filed a petition for bankruptcy relief and thereafter discontinued payments to Park on all its outstanding loans, including that comprising the Evron participation. Despite Garfield's repeated requests, Park refused to repurchase or retire Garfield's interest in the Evron loan. Garfield sought, in count I, a declaration of Park's duty under the participation agreement to repurchase Garfield's interest; in count II, a declaration of Park's obligation to subordinate its right to the proceeds of the Evron collateral to those of Garfield, and to have those proceeds applied to Garfield's participation until it has been satisfied in full, including all accrued interest and costs; count III sought, in the alternative, damages in excess of $250,000 for breach of the participation agreement; count IV requested damages for Park's breach of duty as lead bank; and counts V through VIII sought rescission or damages against Park and Bernstein for fraud or negligent misrepresentation in inducing Garfield to enter into the participation arrangement.

On motion by Park, counts IV and VIII of the complaint were eventually dismissed. On January 24, 1991, Park filed its verified amended answer, amended affirmative defenses and counterclaim, in which it disputed Garfield's interpretation of the participation agreement and denied any liability for breach. Park's counterclaim

sought Garfield's proportionate share of the collection expenses for the Evron loan, which Garfield had agreed to pay under the participation certificate.

On or about March 1, 1991, Garfield filed an amended complaint increasing its damage request and adding count IX, the subject of this appeal, which made the following allegations. Sometime after December 23, 1987, Garfield and Park had executed a contract under which Park agreed to participate in the full amount of a $1.9 million loan by Garfield to Wright Industries, Inc. (Wright participation). On January 29, 1991, when the principal balance due on the Wright note was $1,855,487.64, Garfield notified Park that it had repurchased Park's participation in the note and set off the proceeds from that repurchase against amounts Park owed Garfield "arising from Garfield's participation in Park's lending to Evron," which were the subject of the pending litigation. According to Garfield, those amounts exceeded $2 million, as evidenced by counts I through III, VII and VIII of the complaint. Accordingly, count IX requested that the validity of this setoff be declared.

On March 7, 1991, Park moved for an expedited summary judgment on count IX, alleging that, as a matter of law, Garfield was not entitled unilaterally to set off funds belonging to Park from the Wright participation against the unliquidated, not yet matured, and disputed litigation claims emanating from the Evron participation.

Garfield requested that Park's motion be continued to enable Garfield to prepare a summary judgment motion as to count II, because such judgment in its favor would dispose of the dispute regarding Park's obligation on the Evron note, thereby rendering the setoff valid. On April 26, 1991, Garfield filed a motion for partial summary judgment as to count II, alleging that Park received proceeds in excess of $1.5 million from the bankruptcy sale of the Evron collateral. Garfield further alleged it was "undisputed" that the "Bernstein letter and the undertakings of Park which were contained in it were part of the [Evron participation agreement]"; that by this letter, Park "unambiguously" agreed to "subordinate its position" to Garfield's on the collateral pledged by Evron to secure its loan; and that notwithstanding this agreement, Park has failed to pay Garfield any part of the collateral proceeds, although the collateral assets had been "liquidated for an amount in excess of the balance due on Garfield's participation."

Park filed a reply in support of its motion for expedited summary judgment on May 13, 1991, and apparently filed a memorandum opposing Garfield's summary judgment motion on July 5, 1991,

although the record copy is unstamped. In the latter memorandum, Park maintained that the terms of the participation agreement were controverted; that the parties' interpretations of Bernstein's letter conflicted; and that, under the certificate, Garfield's share of the collateral proceeds was limited to its *pro rata* share of the total indebtedness.

Following a hearing, the court granted summary judgment for Park, finding Garfield's setoff invalid. On August 1, 1991, the court denied Garfield's motion for summary judgment on count II. On August 19, 1991, the court granted Park's request for Rule 304(a) findings as to the ruling on count IX.

I

Garfield initially seeks *de novo* review from the grant of summary judgment to Park, because the question raised on appeal is solely one of law.

In reviewing a grant of summary judgment, this court considers anew the facts and law related to the case and determines whether the circuit court was correct in its ruling. (*Shull v. Harristown Township* (1992), 223 Ill. App. 3d 819, 824, 585 N.E.2d 1164; *In re Estate of Hoover* (1992), 226 Ill. App. 3d 422, 589 N.E.2d 899; but see *Evans v. United Bank* (1992), 226 Ill. App. 3d 526, 589 N.E.2d 933.) Where no factual dispute exists, the question of law is properly reviewed independently of the circuit court's judgment. See *Scottish & York International Insurance Group/Guarantee Insurance Co. v. Comet Casualty Co.* (1990), 207 Ill. App. 3d 881, 885, 566 N.E.2d 477; *Bohnen International, Inc. v. Liberty Mutual Insurance Co.* (1983), 120 Ill. App. 3d 657, 662-63, 458 N.E.2d 644.

■■ Although the decision of whether to grant declaratory relief is discretionary with the circuit court (Ill. Rev. Stat. 1987, ch. 110, par. 2—701; *Howlett v. Scott* (1977), 69 Ill. 2d 135, 142, 370 N.E.2d 1036), the exercise of this discretion is subject to a "searching," or independent, appellate review and is not given the same deference as in other contexts. (*Chicago & Eastern Illinois R.R. Co. v. Reserve Insurance Co.* (1981), 99 Ill. App. 3d 433, 436, 425 N.E.2d 429; *Carl Sandburg Village Condominium Association No. 1 v. Carl Sandburg Village Condominium Homeowners' Association* (1987), 175 Ill. App. 3d 1, 5, 530 N.E.2d 40; *Hernandez v. Fahner* (1985), 135 Ill. App. 3d 372, 381, 481 N.E.2d 1004.) Independent review is justified because "declaratory relief is not dependent upon factors which are difficult for an appellate tribunal to review, such

as *** factual determinations of credibility." *Chicago & Eastern Illinois R.R. Co.*, 99 Ill. App. 3d at 436-37.

██ In the case at bar, both parties agree that, at least for purposes of the summary judgment motion, no dispute exists as to the facts underlying count IX, and whether the setoff was invalid is purely an issue of law. Accordingly, the searching review standard is applicable to this case. See *Carl Sandburg*, 175 Ill. App. 3d 1, 530 N.E.2d 40.

## II

Garfield contends that it was entitled to set off the amounts claimed under the Evron participation against the proceeds from the Wright participation, because this action was consistent with the historical purpose of setoff, and the parties' claims were mutual, mature and liquidated.

██ ■ Setoff most commonly appears as a counterdemand interposed by a defendant against a plaintiff in a lawsuit, arising out of a transaction extrinsic to plaintiff's cause of action. (See, *e.g., Studley v. Boylston* (1913), 229 U.S. 523, 528, 57 L. Ed. 1313, 1316, 33 S. Ct. 806, 808; *Peterson v. Iris Theatre Co.* (1920), 218 Ill. App. 416, 420; *Luther v. Mathis* (1918), 211 Ill. App. 596, 601; Black's Law Dictionary 1230 (5th ed. 1979).) Deriving sanction under statute, and in certain circumstances, at equity (see *Scott v. Armstrong* (1892), 146 U.S. 499, 36 L. Ed. 1059, 13 S. Ct. 148; *Messick v. Rardin* (E.D. Ill. 1934), 6 F. Supp. 200), setoff normally must be pleaded, except in certain limited circumstances. (See *e.g., Luther*, 211 Ill. App. at 601; see also *Lane v. Volunteer Co-operative Bank* (1940), 307 Mass. 508, 30 N.E.2d 821.) There is no inherent right in equity to set off one demand against another; rather, equitable setoff was conceived as a limited remedy and is available only where the debts are mutual, mature, and "of such a certain and ascertainable character as to be capable of being applied in compensation of each other" (*Smith v. Billings* (1896), 62 Ill. App. 77, 85) without the intervention of the court to estimate them. *Faber, Coe & Gregg, Inc. v. First National Bank* (1969), 107 Ill. App. 2d 204, 246 N.E.2d 96.

Here, Garfield unilaterally withheld funds admittedly belonging to Park, in satisfaction for an alleged debt, including damages, which is the subject of a pending lawsuit. Garfield seeks to justify this conduct as "a remedy intended to extrajudicially resolve offsetting claims." Garfield offers no authority for this broad proposition, nor is any provided by the cases upon which it relies. Two cases

simply involve defendants which sought, by pleading setoff, to credit claims of a fixed sum against amounts sued upon by plaintiffs in contract (see *Sterling-Midland Coal Co. v. Great Lakes Coal & Coke Co.* (1926), 240 Ill. App. 216, 217, *rev'd on other grounds* (1929), 334 Ill. 281, 165 N.E. 793; *Kelley, Maus & Co. v. Caffrey* (1898), 79 Ill. App. 278); however, these cases actually support Park's position. Four cases involved a bank's well-recognized equitable right to appropriate funds from its depositor's account to satisfy a bill, note, or other debt the depositor owes the bank, provided that debt is mature. (See *Studley*, 229 U.S. 523, 57 L. Ed. 1313, 33 S. Ct. 806; *Messick*, 6 F. Supp. 200; *Hayden v. Alton National Bank* (1888), 29 Ill. App. 458; *Home National Bank v. Newton* (1881), 8 Ill. App. 563; see also *Faber, Coe & Gregg*, 107 Ill. App. 2d at 209; *Olsen v. Valley National Bank* (1968), 91 Ill. App. 2d 365, 369-70, 234 N.E.2d 547.) This right, however, is rooted in the fact that the depositor, by having his paper payable at the bank, impliedly makes the bank his agent, and authorized to cover his indebtedness by drawing necessary funds from his account. (See, *e.g., Home National Bank*, 8 Ill. App. at 565; *Messick*, 6 F. Supp. 200.) Similarly, in *Studley*, the Court implicitly limited the concept of an extrajudicial setoff to one based upon mutual consent:

> "The banker's lien on deposits, the right of retention and set-off of mutual debts, are frequently spoken of as though they were synonymous, while in strictness, a set-off is a counterclaim which the defendant may interpose by way of cross-action against the plaintiff. But, broadly speaking, it represents the right which one party has against another to use his claim in full or partial satisfaction of what he owes to the other. That right is constantly exercised by business men in making book entries whereby one mutual debt is applied against another. If the parties have not voluntarily made the entries, and suit is brought by one against the other, the defendant, to avoid a circuity of action, may interpose his mutual claim by way of defense ***." (*Studley*, 229 U.S. at 528, 57 L. Ed. at 1316, 33 S. Ct. at 808.)

(See also *Scott v. Armstrong* (1892), 146 U.S. 499, 508, 36 L. Ed. 1059, 1062, 13 S. Ct. 148, 150.) Unlike these cases, there was no agreement between the parties here, express or implied, that the funds be withheld; accordingly, Garfield's argument lacks merit.

■ As stated previously, debts may not be set off unless they are (1) mutual between the parties, (2) mature, and (3) liquidated. See *Faber, Coe & Gregg*, 107 Ill. App. 2d at 209; *Ideal Coated Pa-*

*per Co. v. Samuel Cupples Envelope Co.* (1912), 169 Ill. App. 484; *International Bank v. Jones* (1887), 119 Ill. 407; *Merchants National Bank v. Maple* (1896), 65 Ill. App. 484.

Neither party here disputes that the amounts owed on the Evron and Wright participations were mutual.

Was the debt mature, however? A debt matures on the date it is due. (See *Elzy v. Morrison* (1913), 180 Ill. App. 711, 715-16; *Bonhiver v. State Bank* (1975), 29 Ill. App. 3d 794, 804, 331 N.E.2d 390.) Garfield argues that because the parties agreed under Bernstein's letter that the Evron participation would expire on March 3, 1989, Park had an obligation to repay Garfield for that participation on that date; therefore, when Garfield exercised its right to setoff "on January 29, 1991," it did so against a mature debt. Alternatively, Garfield maintains that the claim matured in November 1990, when the Evron collateral was liquidated for $1.55 million; Park had "agreed to subordinate" its right to the collateral to Garfield, and $1.5 million was more than sufficient to cover the $1 million Garfield invested in the Evron participation.

In reviewing the grant of summary judgment, we accept as true all well-pleaded facts in count IX of the complaint and resolve all reasonable inferences therefrom in a light most favorable to Garfield. See *Killeen v. R.W. Dunteman Co.* (1979), 78 Ill. App. 3d 473, 397 N.E.2d 436.

Although Garfield relies upon the terms in Bernstein's letter in arguing that Park's "debt" to it was mature, Garfield ignores the terms of the participation certificate, which it alleged was also part of the Evron participation agreement. The certificate provided, in relevant part, as follows:

> "All amounts realized by us [Park] from the collateral, if there shall be an event of default, shall be applied pro rata to the payment of the balances of principal and interest then due on our respective participations in the loan on the date of such default. It is understood that we make no representation or warranty, and shall have no responsibility with respect to the execution, validity or collectibility of the Note or any other instrument evidencing said indebtedness ***.
>
> * * *
>
> Any expenses incurred by us in connection with the collection of the indebtedness, or the enforcement of any of the provisions of this loan, shall be borne proportionately between you and us on the basis of our respective interests at the time of incurring such expense, and you agree promptly

to pay us on receipt of notice, any portion of such expense so due from you."

These provisions render Garfield's position open to question, at best. The certificate neither incorporates nor refers to Bernstein's letter. Although the letter allegedly dictated that Garfield's participation would expire on March 3, 1989, it makes no provision for the eventuality of bankruptcy or how that would affect the return of Garfield's investment. Moreover, it is questionable whether this portion of the letter was viable at the time of the setoff; the record reveals that Garfield continued to accept payments on the Evron loan, with interest, long after the March 3 deadline. Garfield's alternative assertion, that the debt was payable at the time of the liquidation of the Evron collateral, derives little support from the agreement. Indeed, even if Garfield's right to payment was found to be superior to Park's, this would in no way render Garfield automatically entitled to the entire collateral proceeds: in its brief opposing Garfield's summary judgment motion as to count II, Park alleged that Garfield was but one of several banks participating in the Evron loan at the time of the liquidation. Clearly, Garfield's argument here is based upon nothing more than its own interpretation of one portion of the alleged agreement. The issue of maturity was open.

■ Liquidated damages can be ascertained by computation or calculation with reference to specific data; unliquidated damages are "such as rest in opinion only." (*Ideal Coated Paper Co. v. Samuel Cupples Envelope Co.* (1912), 169 Ill. App. 484, 486; *cf. Faber, Coe & Gregg*, 107 Ill. App. 2d 204, 246 N.E.2d 96.) Garfield maintains that its participation in the Evron loan was fixed at $1 million, as reflected in the participation certificate, bearing interest at the rate specified in the underlying note; therefore, the total amount required to repurchase or retire that participation was precisely calculable without need for opinions or estimates. We disagree.

■ First, Garfield's determination presupposes the correctness of its own interpretation of the contract terms, but ignores other significant factors. Initially, although it now claims Park's debt to be $1 million, Garfield's count IX asserted that the debt was over $2 million, purportedly to justify the almost $1.9 million setoff. Furthermore, Garfield's prior calculation included its claim for compensatory damages from Park's alleged breach of the agreement; its present claim does not. Therefore, it appears that even Garfield's determination is unsettled.

Second, Garfield's computation ignores the fact of Evron's bankruptcy. Garfield might well not be entitled to a full return on

its investment. Various other banks seek the same proceeds to which Garfield asserts its interest, the resolution of which will require court intervention. According to Park, Garfield's *pro rata* share of the Evron collateral amounts to about $400,000. At this point, the debt is not liquid, but simply a matter of opinion; its exact amount is entirely contingent upon the court's interpretation of the agreement.

Third, Garfield urges that a debt is not unliquidated simply because it is disputed. This argument is misperceived. It is not only the fact of Park's liability that is controverted here; the amount of such liability requires resolution of factual issues. Garfield cites *United States v. Gray* (N.D. Ill. 1982), 552 F. Supp. 943, in support of its contention that disputed debts can be liquidated. That case, however, is unavailing. There, the government sued the defendant on a promissory note and the defendant asserted a setoff based on a claim against a predecessor bank. The court allowed the setoff, finding that the defendant's claims were "clearly liquidated." Unlike the present case, although the underlying claim of right in *Gray* was disputed, the sums allegedly owed were not.

## III

Garfield's final contention is that the circuit court determined, incorrectly, that a declaratory judgment action was not a proper procedural device for deciding the propriety of the setoff, and then proceeded to decide the merits of the controversy against Garfield based on that perceived procedural defect. Park emphasizes that the general requirements of a declaratory judgment action, as well as its propriety as a procedural device to determine validity of setoff, were never in dispute.

In support of its contention, Garfield relies on the following statement by the court during the summary judgment hearing:

> "[A] court should [not] countenance the labeling of a controversy as a declaratory judgment *** where [the plaintiff] admits that it owes money to the defendant but seeks to raise it as a setoff in its complaint as opposed to a setoff by a defendant by way of either counterclaim or otherwise."

A review of the hearing transcript suggests that Garfield's position is unsupportable. The circuit court's questions and comments focused not upon the validity of the declaratory judgment posture, but upon the somewhat inappropriate circumstances surrounding Garfield's setoff.

"I mean essentially boiled down to \*\*\* a simple scenario here, what we have is a plaintiff who says I owe you some money, I admit that and I think or I claim that you owe me some money, and I am not going to pay you the money I owe you until we get a resolution on the disputed claim.
\* \* \*
I find no bases for a setoff under that scenario."

Moreover, immediately following the quotation relied upon by Garfield, the court continued as follows:

"Now, the argument that well, Judge, if we didn't pay they would have had to sue us cannot be used here in my opinion. A, [sic] there may be some substantial risks, federal or state law wise, for a bank refusing to pay on the debt that it admits it owes another bank and to insulate itself from that criticism filing a so-called setoff in my opinion is forcing a square peg in a round hole. What it is doing here is holding out economic leverage which this Court does not wish to participate in."

We disagree with Garfield's interpretation of the basis for the circuit court's ruling. As Park states, the court was never presented with, nor did it consider on the record, the issues of whether the elements of declaratory relief were present, nor whether such relief is permissible with regard to setoff. In its contention that the court "found that a declaratory judgment action could not be used to decide the validity of a setoff" Garfield appears to be confusing the court's position regarding the circumstances of the setoff with a disapproval of Garfield's choice of procedural posture.

■ It should be noted in passing that the purpose of the declaratory judgment statute is to permit the court to address a controversy one step sooner than normal, after a dispute has arisen but prior to any action which gives rise to a claim for damages or other relief. (*Delano Law Offices v. Choi* (1987), 154 Ill. App. 3d 172, 173, 506 N.E.2d 723; *Tait v. County of Sangamon* (1985), 138 Ill. App. 3d 169, 170-71, 485 N.E.2d 558.) A declaration of nonliability for past conduct is not the function of the declaratory judgment statute. (*Howlett v. Scott* (1977), 69 Ill. 2d 135, 370 N.E.2d 1136; *Senese v. Climatemp, Inc.* (1991), 222 Ill. App. 3d 302, 314, 582 N.E.2d 1180.) Relief under the statute requires an actual controversy between the parties, meaning the issues of the case are neither premature nor moot, so as to require the court to pass judgment on an abstract proposition of law, render an advisory opinion, or give legal advice on future events. (*Howlett*, 69 Ill. 2d 135, 370

N.E.2d 1136; *Delano*, 154 Ill. App. 3d at 173.) In the case *sub judice*, Garfield merely sought judicial advice concerning the validity of a set-off it had already taken unilaterally.

For the foregoing reasons, the judgment of the circuit court must be affirmed.

Affirmed.

SCARIANO and McCORMICK, JJ., concur.