FIRST DIVISION

October 23, 2000

No. 1-99-3268

ALDEN NURSING CENTER-LAKELAND, INC., ) Appeal from the

an Illinois Corporation; ALDEN NURSING ) Circuit Court of

CENTER-MORROW, INC., an Illinois ) Cook County

Corporation; ALDEN NURSING CENTER- )

POPLAR CREEK, INC., an Illinois )

Corporation; OAK PARK CONVALESCENT AND )

GERIATRIC CENTER, INC., d/b/a )

Metropolitan Center of Oak Park; )

EDGEWATER NURSING AND GERIATRIC CENTER, )

INC.; CHICAGO RIDGE NURSING CENTER, )

INC.; ROYAL ELM CONVALESCENT AND )

GERIATRIC CENTER, INC.; ALDEN NURSING )

CENTER-WENTWORTH, INC., an Illinois )

Corporation; ALDEN PRINCETON )

REHABILITATION AND HEALTH CARE, INC.; )

and ALDEN HEATHER REHABILITATION AND )

HEALTH CARE CENTER, INC., )

) 

Plaintiffs-Appellees, )

)

v. ) 

)

ANN PATLA, Director of the Department )

of Public Aid, and THE DEPARTMENT OF )

OF PUBLIC AID, ) Honorable

) Aaron Jaffe,

Defendants-Appellants. ) Judge Presiding

JUSTICE McNULTY delivered the opinion of the court:

The Illinois Department of Public Aid (Department) sought to recover overpayments it made to 10 nursing homes.  The nursing homes requested hearings and sought to set off alleged Department underpayments against the overpayments.  The hearing officers refused to consider evidence the nursing homes presented to show that the Department failed to pay other amounts due when it made the overpayments.  The Director of the Department adopted the hearing officers' decisions, holding that sovereign immunity precluded the hearing officers from considering the claims for underpayments.  The trial court reversed the Director and ordered the hearing officers to consider the proffered evidence of underpayment.  The Department appeals.

In December 1993 the Department found, through an audit, that it had overpaid Oak Park Convalescent & Geriatric Center (Oak Park) $218,853.26.  In November 1994 the Department sought to recover the overpayments, and it gave Oak Park notice of the right to a hearing concerning the assessment.  The Department attached to the notice a list of 166 patients on whose behalf the Department made the overpayments, and next to each name the Department indicated the amount it overpaid and the months for which it made the overpayments.

Following two further audits in cooperation with Oak Park, in August 1996 the Department reduced to $192,369.59 the amount of the overpayments it sought to recover.  Oak Park requested a hearing.  The parties stipulated to the admissibility of the Department's exhibits showing the amounts overpaid for each of the listed patients.  Oak Park's attorney said, "We do not dispute the numbers. *** In fact, we do agree with those numbers."  But Oak Park objected that the Department did not take into account the parts of the patient accounts showing a lack of full payment.  Oak Park sought to offset all unpaid balances in its patients' accounts against the amount the Department sought to recover.

Oak Park tendered several exhibits showing the amounts it believed the Department owed, totaling $184,847.16.  The Department objected that the hearing officer lacked jurisdiction to permit the setoff.  The Department did not review the numbers in Oak Park's exhibits or agree to their accuracy. 

The hearing officer added the exhibits to the record as Oak Park's offer of proof, but he agreed with the Department's argument that the Court of Claims had sole jurisdiction to hear Oak Park's claim for amounts it sought to set off against the Department's recovery.  Thus, the hearing officer recommended upholding the decision to recover $192,369.59 from Oak Park.  By letter dated November 1996, the Director of the Department adopted the hearing officer's recommendation.

Oak Park sued for judicial review of the agency's decision, arguing that the agency should have set off the alleged underpayments against the overpayments.  It did not challenge the finding of overpayments amounting to $192,369.59.

The trial court consolidated the case with eight similar cases, all brought by nursing homes against the Department for administrative review, where the Director upheld the Department's right to recover overpayments the nursing homes received, but found the hearing officers lacked jurisdiction to adjudicate the nursing homes' claims for setoff of underpayments.  One other case joined the consolidated litigation prior to the trial court's decision.

Not all cases appeared in precisely the same posture.  For example, the Department sought to recover overpayments of $100,520.89 from Edgewater Nursing & Geriatric Center (Edgewater).  Like all of the other respondents in the administrative agency actions, Edgewater admitted the amount of the overpayments on the indicated accounts.  But Edgewater claimed $268,278.26 in underpayments.  It asked the trial court to enter a judgment awarding it this amount plus attorney fees.  Several other respondents also expressly sought judgments against the Department for the amount of underpayments, plus attorney fees, minus the overpayments.  In those cases the respondents, unlike Oak Park, expressly sought a money judgment against the Department.

The administrative action against Alden Nursing Center - Lakeland (Lakeland) stood in a unique posture.  In May 1991, the Department notified Lakeland of the results of an audit which showed overpayments of $117,445.17.  Lakeland requested a hearing.  A second audit reduced the amount sought to $115,224.27.  Lakeland's controller gave the Department's auditors records and documents to substantiate claims that the Department underpaid Lakeland for some services during the audit period.  The Department did not take the information into account in arriving at the overpayment amount.

At the hearing Lakeland sought to introduce evidence of underpayments to offset the overpayments.  The hearing officer held that he lacked jurisdiction to set off the alleged underpayments against the overpayments.  He refused to admit into evidence Lakeland's testimony and exhibits concerning underpayments.  He recommended recovery of $115,224.27 from Lakeland.  By letter dated March 15, 1993, the Director announced his decision adopting the hearing officer's recommendation.  Lakeland filed a complaint for administrative review later that month, alleging that it "did present evidence of a set-off and counter-complaint in the amount of $190,383.95."  At this point, the Lakeland case had essentially the same posture as all the other cases before the court on this appeal.  But following briefing and argument on Lakeland's complaint, the trial court, on February 14, 1994, remanded the cause to the Department for determination of the amounts underpaid, and with instructions to set off the underpayments against the overpayments.  Instead of seeking immediate appellate review, as the Department did in all the other cases now on appeal, the Department proceeded to hold the hearing the trial court ordered.

The hearing officer who heard the case on remand took evidence on nine separate dates from May 1994 until March 1995.  Lakeland's controller presented the bulk of the evidence.  He explained that Lakeland kept individual records for each patient, showing all amounts billed for services to that patient and amounts received.  He created an exhibit showing the unpaid balances for each patient.  Lakeland demanded a setoff of the full unpaid amounts shown against the overpayments.

The controller testified that each listed patient qualified for public aid from the Department.  He knew this by the coding used on the accounts.  Some accounts showed the code PV, meaning that private sources should pay the coded charge; some showed PA, meaning public aid authorized; some showed PP, meaning public aid pending, and some showed PN, meaning public aid not authorized.  Lakeland sought recovery for all unpaid charges coded PA, PP, or PN.  Lakeland often used these codes interchangeably.  Generally, after a patient filed an application for public aid, Lakeland would list the patient as PP, while the Department reviewed the application; later, Lakeland might change the coding to PN, if Lakeland still needed some document showing the expected entitlement to public aid.  If the Department formally approved the application, Lakeland might code further charges as PA.

The controller detailed the accounting process for some patient accounts chosen as examples.  One such patient received social security payments.  The account showed an unpaid charge, listed simply as "private miscellaneous."  The controller admitted he did not know to what services the charge pertained.  The account showed payments Lakeland received from social security and from a pension for that patient.  Lakeland made an adjustment to the account, writing off a balance as uncollectible.  Because Lakeland did not recover the full amount it charged for its services to the patient from the patient's other sources, Lakeland charged the Department for the unpaid balance.

During a break in the hearing, the controller spoke to a Lakeland staff member about the private miscellaneous charge.  He then testified that Lakeland classified retroactive increases in the daily rate charged to patients as private miscellaneous charges.  He did not know the amount of the increase in the daily rate or the number of days for which Lakeland sought the retroactive increase for the specific account.  On cross-

examination the controller admitted that the Department did not have a duty to pay private charges, and he could remove such charges from the request for setoff.  

The controller explained that every month the Department sent Lakeland a prepayment report listing all the accounts and services for which the Department intended to reimburse Lakeland.  Lakeland reviewed the report and returned it, with corrections, to the Department.  The Department then sent a check and a remittance advice again listing all accounts and services reimbursed by the check.  When Lakeland found the Department failed to reimburse it for a charge for which Lakeland had sought payment, a Lakeland employee would call the Department to point out the discrepancy.  Lakeland might resubmit a bill for the unpaid services.  Sometimes the Department paid and sometimes it did not.

According to the controller, the Department had the right to deny a claim for certain services or for an individual not covered by public aid.  The Department frequently failed to pay claims without formally denying the claim.  Sometimes Lakeland called the Department repeatedly concerning a claim without getting any final determination and the bill remained unpaid.  No coding on the accounts indicated whether the Department denied a request for payment, except that in some instances Lakeland might write off an unpaid amount as uncollectible following the Department's denial of a request for payment.

If a patient qualified for social security, the patient's family received the checks.  Some families signed the checks over to Lakeland, but others cashed the checks and paid Lakeland in cash.  The Department required use of social security funds, or funds from other outside sources, for the patient's care.  The Department received notice from the Social Security Administration of the amount paid to each patient, and the Department based its payments to Lakeland on that information.  If the patient's family withheld part of the social security payment, and the Department made the correct payment based on accurate information about the social security, Lakeland would show an unpaid balance in the patient's account.  The controller agreed that the Department would not be liable for the unpaid balance.  He could not determine from the accounts whether such facts explained any of the unpaid balances he sought to recover.  The Department's attorney led the controller through review of many accounts in great detail, including several in which Lakeland apparently sought to recover from the Department amounts of social security the family may have withheld.

A financial services representative for Lakeland said that she or her supervisor called the Department when they found the Department had not sent payments requested in a revised prepayment report.  She continued to pursue the matter with the Department until she learned why it had not paid that charge.  She could not tell from the patient account information in evidence whether the Department had formally denied a claim or simply left it unpaid without explanation.

A Department employee who handled requests for payments from the nursing homes testified that the account information in evidence lacked data essential for processing claims for payments.  The documents lacked recipient identification numbers, dates of service, and description of the services.  The witness could not even determine whether the Department had approved the patient's application for the receipt of public aid.  The Department never simply failed to process a request for payment or a challenge to the sufficiency of a payment.

The hearing officer, in her 57-page report summarizing the hearing, made very extensive, detailed findings concerning the claims for setoff.  She said:

"All of [Lakeland's] underpayment claims are brought to this forum in the form of a counterclaim. [Lakeland] has the burden of proof and must prove, by a preponderance of the evidence, that these underpayment claims are legitimate and owing by the Department. ***

***

*** When the Department auditors audit a provider, they should be able to rely on the accuracy and adequacy of [the provider's] records.  The Department is the payor [of] last resort for recipients' room and board charges.  If a public aid recipient's ledger card entry shows a credit balance, the auditors should be able to record that as an overpayment and the Department should recoup that overpayment from the facility.  Should the provider supply additional records which prove to the auditors that its own ledger cards were in error, it can reduce the overpayment amount.  This was done in the first hearing in this matter where a re-audit reduced the original recovery amount from $117,445.17 to $115,224.27.  A credit balance entry on a ledger card is 
prima
 
facie
 evidence of that overpayment which can be and often is rebutted by that additional documentation.

However, the same cannot be said for an underpayment claim.  A debit balance entry on a ledger card is NOT 
prima
 
facie
 evidence of that underpayment.  The Department, while the payor of last resort, is not a guarantor of any and all outside income which facilities, for one reason or another, do not receive.  The testimony in this matter has made it abundantly evident that there are many situations where the existence of a debit does not automatically require a payment by the Department. [The controller] said there are legitimate reasons why the Department might not pay on a claim.  Both he and [Lakeland's financial services representative] said there is nothing on the ledger card delineating between what they would consider a legitimate non-payment and a claim [Lakeland] believed the Department should pay."

The hearing officer first considered the many charges for which Lakeland lacked documentation showing the nature of the service rendered or the availability of other potential sources for payment.  She recounted testimony concerning five documented accounts for which, after testimony, the controller agreed that the Department did not owe the amounts included in Lakeland's request as unpaid balances.  The hearing officer could not find that Lakeland proved its entitlement to the unpaid balances in accounts for which it lacked full documentation.

For some of the documented accounts, Lakeland sought to recover charges coded as private, or payable by the patient's individual insurance, because the controller concluded that the coding was erroneous.  The hearing officer found that the controller failed to prove a coding error by a preponderance of the evidence.

The hearing officer found that the Department may have properly rejected many of the claims for payment due to the ineligibility of the patient.  She found Lakeland had not presented adequate proof to show for many specific charges that the Department had no such proper basis for rejecting the claims.  The hearing officer rejected as incredible the controller's testimony that all patients had established the right to public aid, including those for whom Lakeland's records showed that public aid was not authorized, as well as those for whom a public aid application was pending.

With complete recitations of the pertinent evidence for a number of specified charges, the hearing officer explained the insufficiency of the evidence to show the Department's liability.  In her summary, she added that she did not believe that Lakeland's staff had failed to pursue the many charges it sought to recover, totaling in excess of $190,000, so she concluded that the Department must have provided acceptable reasons for denying many of the claims.  She found that Lakeland failed to prove an entitlement to any setoff.  Therefore, she recommended a finding that Lakeland owed the Department $115,224.27 for overpayments it received.  In April 1995 the Director adopted the hearing officer's recommendation.

Lakeland again sought administrative review of the Director's decision.  The trial court consolidated the case with the other cases in which nursing homes sought setoffs, despite the fact that in this case, alone, the hearing officer admitted into evidence all testimony and documents by which Lakeland sought to prove its entitlement to a setoff, and only in this case did the hearing officer evaluate the weight and credibility of that evidence to determine whether the nursing home presented sufficient proof of the right to the amounts claimed.

The parties in the consolidated cases in the trial court briefed and orally argued the issue of whether sovereign immunity barred the Department from considering the claims for setoff in all of the consolidated cases.  The parties did not address the special posture of Lakeland or the hearing officer's detailed findings on the adequacy of the evidence.  The court found that in all the consolidated cases the Department "erred in refusing to allow Plaintiffs to present evidence of underpayments owed to them by the Department."  The court included the decision regarding Lakeland in the list of decisions reversed, without discussion of the hearing officer's full consideration of all evidence Lakeland presented concerning underpayments.  

On the Department's motion, the court found no reason to delay appeal of the decision.  We have jurisdiction to hear the Department's appeal pursuant to Supreme Court Rule 304(a).  155 Ill. 2d R. 304(a).

We review the Director's holdings on questions of law 
de novo
, but we will not disturb a finding of fact unless it is contrary to the manifest weight of the evidence.  
Raintree Health Care Center v. Illinois Human Rights Comm'n
, 173 Ill. 2d 469, 479, 672 N.E.2d 1136 (1996).  We do not defer to the circuit court's decision.  
Pontiac Lodge No. 294 v. Department of Revenue
, 243 
Ill. App. 3d
 186, 192, 611 N.E.2d 62 (1993).

Based on the doctrine of sovereign immunity, the hearing officers disallowed evidence relating to amounts the Department owed the nursing homes in all the consolidated cases except Lakeland.  Our supreme court explained sovereign immunity in 
People ex rel. Manning v. Nickerson
, 184 Ill. 2d 245, 702 N.E.2d 1278 (1998).  There, a state agency sued for an injunction to compel the 
defendant
 to remove a building allegedly built on state property and for damages due to the alleged use of state lands.  The 
defendant
 filed a counterclaim seeking a judicial determination of the line between his property and the state's property, and he sought money damages for several torts, including trespass.  
Nickerson
, 184 Ill. 2d at 247.

The agency argued that the Court of Claims had exclusive jurisdiction over the counterclaim.  Our supreme court noted that the Court of Claims Act (705 ILCS 505/8 (West 1996)) expressly gave the Court of Claims exclusive jurisdiction over all tort claims against the state.  
Nickerson
, 184 Ill. 2d at 248-49.  Regarding the question of whether a circuit court could hear a counterclaim based in tort, our supreme court held:

"On one level, *** fairness seems to dictate that the defendant should be allowed to raise 
any
 counterclaim in the circuit court:  the state started this fight in the circuit court and must live with the consequences.  The doctrine of sovereign immunity, however, is not about fairness.  The legislature has conferred immunity upon the state, and the legislature--only the legislature--can determine when and where claims against the state will be allowed."  (Emphasis in original.)  
Nickerson
, 184 Ill. 2d at 249.

Accordingly, the court concluded that the Court of Claims had exclusive jurisdiction to consider the 
defendant
's counterclaim for money damages.

But the court distinguished the counterclaim for a determination of the boundary line dividing the two properties.  The court said:

"The central issue in the case is who owns the land in question, and that issue is before the circuit court by virtue of the state's complaint.  The defendant's response is that he owns the land--not the state.  Thus, the property claims raised by the defendant are defensive in nature and are asserted for the purpose of defeating the state's action, and not for the purpose of obtaining an affirmative judgment against the state.  Because the circuit court has jurisdiction to decide the state's request for an injunction and money damages, and that necessarily involves a determination of the defendant's claimed ownership interest, sovereign immunity does not bar the circuit court from exercising jurisdiction over the defensive, property claims raised in the counterclaim."  
Nickerson
, 184 Ill. 2d at 249-50.

Thus, the Court of Claims has exclusive jurisdiction over the claims assigned to it by the Court of Claims Act, even if the claims appear in a counterclaim.  But if a decision on an agency's claim necessarily involves determination of an issue a 
defendant
 raises, then the court or administrative law judge with jurisdiction to decide the agency's claim also has jurisdiction to decide the issue, regardless of whether the 
defendant
 raises the issue in a counterclaim or as a defense to the agency's claim.

Here, the Department sought to recover overpayments it made for specified patients at specified times.  The nursing homes sought to set off against the Department's claims amounts the Department allegedly owed – sometimes for the same patients – for services other than those for which the Department overpaid.  The nursing homes' claims are contractual in nature and therefore the Court of Claims Act gives the Court of Claims exclusive jurisdiction to consider them.  705 ILCS 505/8(b) (West 1996); 
Klopfer v. Court of Claims
, 286 
Ill. App. 3d
 499, 503-04, 676 N.E.2d 679 (1997).

All of the nursing homes looked through the Department's specific claims with the Department's auditors and persuaded the auditors to reduce the claims on the basis of the accounting records.  When the Department presented the adjusted claims to the hearing officers, the nursing homes stipulated to the accuracy of the Department's numbers as correct reflections of the amounts the Department overpaid for the patients and times specified.  Determination of whether the Department made the alleged overpayments did not in any manner involve determination of whether the Department also at other times underpaid for other services for other patients.  Under 
Nickerson
, the hearing officer, the Director, and the circuit court all lacked jurisdiction to consider the nursing homes' claims.  Our legislature, in enacting the Court of Claims Act, granted that court exclusive jurisdiction over all of the nursing homes' claims for underpayments, whether the nursing homes sought to raise them by way of defense, counterclaim, or in a separate complaint.

The proceedings on Lakeland's claims show the wisdom of the legislative scheme.  In its complaint for administrative review of the detailed decision rejecting the set-off claims for insufficient evidence, Lakeland alleged exactly one ground for overturning the findings: "the identical documentation was accepted as *** substantiating the Department's claim against the Plaintiff but was not accepted as supporting the Plaintiff's claim against the Department."  Lakeland, like all the nursing homes involved in the consolidated litigation, sought to recover all of the unpaid balances in all accounts of patients who applied for public aid.  Lakeland's controller swore that Lakeland billed the Department for all of the unpaid services.  When the Department sent payments not including the amounts Lakeland now seeks to set off, a Lakeland employee called the Department to learn why it had not included the requested sum.  Lakeland's controller admitted that the Department could have a number of legitimate reasons for denying a payment request.  The financial services representative said that she could not determine, from the records presented at the hearing, whether the Department had provided such an explanation for any or all of the charges Lakeland sought to recover.

The hearing officer perceptively summarized the situation: because the Department is the payor of last resort, a credit balance in the account of any public aid recipient constitutes 
prima facie
 evidence of overpayment.  The controllers of the nursing homes conceded as much by stipulating to the Department's calculations of overpayments.  But a debit balance in a patient's account is not 
prima facie
 evidence that the Department underpaid, both because other sources may be responsible and because the Department owes nothing until the nursing home has provided full, acceptable documentation for its claim for payment.  A Department employee gave uncontradicted testimony that the documents presented in court did not include all of the information the Department required before making payments.  The complaint for administrative review in Lakeland shows that the nursing homes seek to use the Department's suit as a shortcut to avoid presentation of the proof the Department and the Court of Claims require before finding that the Department has wrongly refused to pay a bill.

Lakeland did not present any evidence concerning the current status of its requests for payment of the unpaid balances.  The process for considering those requests, first by the agency employees who handle billing disputes, then by the Court of Claims, should continue.  The legislature has foreclosed the attempted shortcut through a counterclaim by giving the Court of Claims exclusive jurisdiction over claims for payments due for the services alleged.

Several of the nursing homes, including Lakeland, offer two further arguments for reversing the Director's decision.  First, Lakeland contends that it has a common law right in equity to set off the underpayments against the overpayments it must pay the Department.  But the equitable right cannot defeat the legislature's explicit award of exclusive jurisdiction to the Court of Claims.  See 
City of Springfield v. Allphin
, 82 Ill. 2d 571, 578, 413 N.E.2d 394 (1980).  Moreover, the common law right applies only where the debts are mutually certain and readily ascertainable.  
Bank of Chicago-Garfield Ridge v. Park National Bank
, 237 
Ill. App. 3d
 1085, 1091, 606 N.E.2d 72 (1992).  The hearing officer's decision in Lakeland demonstrates in detail why the Department's alleged debts cannot be considered certain and readily ascertainable.

Lakeland further maintains that section 2-608(a) of the Code of Civil Procedure (the Code) (735 ILCS 5/2-608(a) (West 1994)) establishes its right to assert the counterclaim in Department proceedings.  Although the Code generally does not apply to agency proceedings (
Desai v. Metropolitan Sanitary District of Greater Chicago
, 125 
Ill. App. 3d
 1031, 1033, 466 N.E.2d 1045 (1984)), the Code may fill a procedural gap if the statutes regulating agency proceedings leave some matters of procedure unregulated.  
Opyt's Amoco, Inc. v. Village of South Holland
, 209 
Ill. App. 3d
 473, 490-

91, 568 N.E.2d 260 (1991).  However, an expansion of the agency's jurisdiction cannot qualify as a procedural matter.  
Trupp v. First Englewood State Bank
, 307 
Ill. App. 258, 266, 30 N.E.2d 198 (1940); see 
Ellegood v. American States Insurance Co.
, 266 
Ill. App. 3d
 135, 139, 638 N.E.2d 1193 (1994).  Accordingly, the Code cannot justify an expansion of the hearing officer's powers to adjudication of the counterclaim here.

Several other nursing homes, including Oak Park and Edgewater, argue that the circuit court had jurisdiction over the counterclaim because the nursing homes could have brought an action in 
mandamus
 seeking an order directing the Department to consider their claims for payment.  Several of the nursing homes, including Edgewater, expressly prayed for money judgments against the Department, and 
mandamus
 will not lie against a state agency for such relief.  
Senn Park Nursing Center v. Miller
, 104 Ill. 2d 169, 188-89, 470 N.E.2d 1029 (1984).  All of the nursing homes seek to enforce present claims for payment, and not to enjoin the Department's officers from taking future actions in excess of authority.  See 
Ellis v. Board of Governors of State Colleges & Universities
, 102 Ill. 2d 387, 394-95, 466 N.E.2d 202 (1984).  Because the relief requested is not available in 
mandamus
, the nursing homes' argument must fail.

Finally, Oak Park and several other nursing homes contend that the Department's audits violate federal regulations because the Department did not publish its own audit guidelines.  But each nursing home understood the Department's audit procedures well enough to point out errors in the precise accounts for which the Department sought reimbursement of overpayments, and the successive audits reduced the amounts the Department claimed.  For all such claims presented to the hearing officers, the nursing homes understood audit procedures well enough to agree that the Department's exhibits accurately reflected amounts the Department overpaid for specified public aid patients for services at specified times.  The nursing homes had the opportunity to present to the hearing officer evidence of the correct balances, under accounting principles in accord with federal regulations, for the specific patient accounts the Department put at issue.  Instead, the nursing homes conceded that the Department presented correct figures for those accounts.

Under 
Nickerson
, the nursing homes can sue only in the Court of Claims to recover sums the Department owes for services the nursing homes have rendered to public aid recipients.  The agency proceedings concerning overpayments do not alter this limitation on the jurisdiction of the hearing officer, the Director, and the circuit court.  Because the Director correctly determined that she lacked jurisdiction to consider the nursing homes' claims for underpayments, we reverse the trial court's decision and reinstate the decisions of the Director in all of the consolidated cases.

Reversed.

FROSSARD and COHEN, JJ., concur.